Bell v. Bell.

ANNE C. BELL vs. LOWRY M. BELL, JR.

Norfolk. February 15, 1983. — June 22, 1983.

Present: HALE, C.J., CUTTER, & KAPLAN, JJ.

*Divorce and Separation*, Separation agreement, Alimony. *Contract*, Separation agreement. *Public Policy.*

Language in a separation agreement providing that in the event of the
   wife's "living together with a member of the opposite sex, so as to give
   the outward appearance of marriage" the monthly payments which
   the husband had agreed to make as alimony would terminate was in-
   terpreted, in the circumstances, along with other provisions in the
   agreement stating that the wife was primarily dependent on her for-
   mer husband for support and that neither the husband nor the wife
   would interfere with the other's liberty, as calling for a cessation of
   alimony only upon her remarriage or in circumstances so closely like
   remarriage as to result in the wife's acquiring significant actual sup-
   port or a new right to support from a man. [193-196] HALE, C.J.,
   dissenting.

LIBEL for divorce filed in the Probate Court for the coun-
ty of Norfolk on October 22, 1974.

A complaint for contempt filed April 8, 1981, was heard
by *Kopelman, J.*

*Monroe L. Inker (Stephen C. Maloney* with him) for
Anne C. Bell.

*Charles J. Humphreys (Roberta F. Sawyer* with him) for
Lowry M. Bell, Jr.

CUTTER, J. Mrs. Bell appeals from the dismissal of her
contempt complaint against her former husband for his fail-
ure to make support payments allegedly due to her under a
judgment of divorce. The issue before us is the interpreta-
tion of a provision in the parties' separation agreement,
reading that document as a whole and in the light of rele-

vant Massachusetts law.[1]  The agreement and all the evidence before the probate judge are before us.  We apply our own interpretation of the separation agreement to the subsidiary facts found by the judge (as distinguished from certain conclusions drawn by him, we think erroneously, from his subsidiary findings).

The parties were married in 1950.  They have had two children, one born in 1956 and one born in 1958.  Bell was in 1975 a vice president of a substantial company.  Mrs. Bell then was unemployed.  Differences arose between Mrs. Bell and Bell.  By 1976 they had been separated for some time.

On April 26, 1976, the parties entered into a separation agreement.  By its terms Bell (subject to arbitration in the event of a substantial decline in his gross income) was to pay (as alimony for tax purposes) significant monthly amounts for the support of Mrs. Bell.[2]  These payments were to decrease in amount over fifteen years following the entry of final judgment of divorce and were to "terminate upon the happening of the following contingencies:  (1) the [w]ife's death, (2) the [w]ife's remarriage, and . . . (3) [the w]ife's living together with a member of the opposite sex, so as to give the outward appearance of marriage at any time prior to May 1, 1981, whichever of the . . . three . . . contingencies happens first."  For convenience the preceding subparagragh (3), is hereafter sometimes referred to as "the disputed language."

---

[1] We refrain from stating any views concerning the conduct of any person involved in this matter.  Any such views would be completely immaterial to the issue of interpretation.

[2] The Bells owned in 1976, as tenants by the entirety, a house in Cohasset worth $114,000, subject to a mortgage of about $36,000. They owned jointly certain savings accounts and securities.  The agreement made an allotment of property to Mrs. Bell, including a transfer to her of (a) the Cohasset house (subject to the mortgage), (b) its tangible contents, (c) certain other specified tangibles, and (d) their joint accounts and their jointly held security accounts.  The husband was to pay to her $100,000 on the entry of final judgment of divorce.  It is not contended in this case that Bell failed to carry out these other provisions of the separation agreement which were to take effect upon the completion of the original divorce proceedings.

A judgment nisi of divorce was entered as of November 28, 1975. This judgment incorporated the separation agreement, specifically stating that the "[a]greement shall survive this judgment and have independent significance." Bell has married again since the judgment became absolute.

On April 8, 1981, Mrs. Bell filed this contempt complaint. Bell answered contending that his obligation to support Mrs. Bell had terminated because she was "living together with a member of the opposite sex so as to give the outward appearance of marriage."

Following a trial the probate judge dismissed Mrs. Bell's contempt complaint.[3] She has appealed. The judge made subsidiary findings of fact essentially as follows:

(a) Mrs. Bell resided at the Cohasset house (see note 2 *supra*) until March, 1978. That spring she spent some time at the Cohasset house and some time at the one-bedroom Boston apartment of a man referred to in the record as J.R. From June, 1978, to October, 1979, she lived in J.R.'s apartment except for a total of three weeks spent "with her daughter on an irregular basis." From October, 1979, through June, 1980, she stayed in the Cohasset house on a sporadic basis but "for the most part" stayed at J.R.'s apartment. She sold the Cohasset house on April 1, 1980, and had removed her belongings by June, 1980.

(b) The apartment lease stands solely in J.R.'s name. Mrs. Bell's name does not appear in the lease or on the mailbox or the door. The monthly rent ($450) and utilities (except for Mrs. Bell's long distance calls, which she has paid) are paid by J.R. From June, 1978, through May, 1981, she "cohabited with J.R." at the apartment. She "purchased all of the food and did most of the cooking and cleaning." Part of the furniture at the apartment is hers. Part belongs solely to J.R.

---

[3] He also dismissed with prejudice a counterclaim filed by Bell seeking to recover amounts of alimony theretofore paid by him, and entered an order that Bell and Mrs. Bell were to pay their own costs and counsel fees. No appeal was claimed by Bell from the dismissal of his counterclaim.

(c) Mrs. Bell and J.R. "have always maintained separate bank accounts, checking accounts, and investments." They have never commingled assets or held joint bank accounts.

(d) Until June, 1980, Mrs. Bell remained a member of a club in Cohasset. During this time she took J.R. there as her guest about once a month for tennis and social functions. He reciprocated by taking her as his guest to clubs to which he belongs. After June, 1980, she reimbursed him for half the bills incurred by him for taking her to his clubs as his guest.

(e) Mrs. Bell has never maintained a mail address at J.R.'s apartment. She received mail at Cohasset until she sold the house in 1980. Thereafter she received mail in care of her employer until her employment (apparently obtained after the divorce) was terminated on January 31, 1981. Since then she has received mail at a post office box.

(f) She and J.R., in addition to playing golf and tennis and dining together, have played bridge together about twice a week, occasionally at clubs "prescribed by" a national contract bridge league. They have taken trips together. She has paid one-half of the costs of each trip. They have given cocktail parties together and attended such parties together. At no time has Mrs. Bell represented to any third party that she was married to J.R. nor has she ever used his surname.[4]

The probate judge concluded that, as of February 1, 1981, Mrs. Bell "had established a permanent relationship with J.R." and "was habitually residing with . . . [him] in a life style which would lead a reasonable person to believe that they were living in a marital relationship" and that their "conduct . . . gave the outward appearance of marriage." The judge also concluded that Mrs. Bell as of Feb-

---

[4] The probate judge found, after hearing Mrs. Bell's testimony (and we, after reading that testimony agree) that Mrs. Bell "did not, at any time, conceal her cohabitation with J.R. either from the court or from Bell." Certainly her testimony, as we read it, was marked by candor and showed no attempt to conceal or distort any conduct even if it might turn out to be adverse to her present contentions.

ruary 1, 1981, "was receiving a measure of support from J.R. by virtue of his paying the rent and utilities and that continued alimony paid by" Bell "would, to a certain extent, provide" Mrs. Bell "with overlapping support."

The probate judge, in addition to drawing conclusions from his subsidiary findings as just indicated, made rulings of law (1) that the "relationship [of Mrs. Bell and J.R.] is sufficient to create an outward appearance of marriage"; (2) that the language about "outward appearance of marriage" relates to Mrs. Bell's conduct and the "objective nature of the relationship and does not depend on whether . . . third persons are led to believe in the existence of a ceremonial marriage"; (3) that the disputed language of the agreement does not require Bell to prove that Mrs. Bell represented to third persons that she and J.R. were married; and (4) that Mrs. Bell has forfeited her right to alimony under the agreement after February 1, 1981, because to rule otherwise would permit an ex-wife to receive support from another man and still compel her ex-husband to pay alimony by simply refraining from any formal marriage ceremony.[5]

1. Massachusetts does not recognize common law marriage. See *Davis* v. *Misiano*, 373 Mass. 261, 262-263 (1977), holding that, despite "[c]ohabitation [with a man] within the Commonwealth, a woman has no right to receive sup-

---

[5] The judge also ruled, perhaps in too expansive terms, that it was permissible to receive extrinsic testimony concerning the disputed language of the separation agreement, which he regarded as ambiguous, "as an aid to construing the contract and the intent of the parties." He received testimony from the attorney who represented Bell in negotiating the separation agreement. Mrs. Bell's former attorney had died before the time of trial. We do not give weight to Bell's former attorney's somewhat inconclusive testimony so far as it relates to that attorney's *purpose* in requesting the insertion of the disputed language. See Liacos, Massachusetts Evidence 385-392 (5th ed. 1981). See also *Gustafson* v. *Svenson*, 373 Mass. 273, 275 (1977). Cf. *McKelvy* v. *Terry*, 370 Mass. 328, 334-335 (1978). We regard his testimony as helpful only as it discloses some background of the negotiations, by showing that the insertion of the disputed language was requested by Bell's former attorney, and that the suggestion in some respects was objected to by Mrs. Bell's then counsel.

port" from him, absent a formal solemnization of marriage. See also *Heistand* v. *Heistand*, 384 Mass. 20, 24-26 (1981). Compare *Glazer* v. *Silverman*, 354 Mass. 177, 179-181 (1968), and *Ruquist* v. *Ruquist*, 367 Mass. 662, 664-667 (1975), in each of which, on balance, special equitable considerations (not present here) were deemed sufficient to justify sustaining the trial judge's termination of support provisions.

Certainly, unless perhaps by some contractual arrangement, Mrs. Bell could not obtain in Massachusetts the right to support from J.R. without assuming the obligations to him involved in a ceremonial marriage. The evidence shows that she was expecting no support from J.R. and asserting no claim to it. Instead she was attempting to pay her reasonable share of their joint expenses.

2. No Massachusetts case dealing with a provision precisely like the disputed language has been called to our attention. See as to somewhat related problems, *Surabian* v. *Surabian*, 362 Mass. 342, 346 (1972), and cases cited. See also *Gerrig* v. *Sneirson*, 344 Mass. 518, 520-521 (1962); Lombard, Family Law §§ 1265, 1351, 2245 (1967 and Supp. 1981). An annotation in 98 A.L.R.3d 453 (1980) deals (see n.6 at 457) primarily with the effect upon alimony of an ex-wife's conduct after the divorce judgment where there is either no separation agreement or the agreement is merged in the judgment.

When the Bells' separation agreement is read as a whole, one probable meaning of the disputed language becomes apparent. As the *Surabian* case indicates, the death or remarriage of Mrs. Bell, by the express terms of the separation agreement, would have terminated her right to alimony. Actual remarriage presumably would have given her a "right to be supported by another man." See *Southworth* v. *Treadwell*, 168 Mass. 511, 512-513 (1897). The disputed language appears in the same sentence of the separation agreement as the provisions concerning death and remarriage (both circumstances in which Mrs. Bell would have no further need for support). This we regard as strong indication that, where there is a continuing need for a right to

support, that need should be a primary consideration in interpreting and applying the disputed language.

The disputed language also must be read in connection with other provisions of the separation agreement. It was expressly recited that, although Mrs. Bell (in 1975) had an unstated amount of "assets standing in her own name," she was "primarily dependent on the [h]usband for her care, support and maintenance." There also was an explicit general provision that "neither the [h]usband nor the [w]ife will hereafter interfere with the personal liberty of the other, and each may lead his or her life free from any criticism or restraint by the other." The purpose of the entire agreement was stated in part as "to settle the [h]usband's obligation arising out of the marital relationship to support and maintain the [w]ife" as set forth in the agreement.

The predominant interest of the wife plainly was in making certain that she would have the support reasonable for her to expect from a business executive of some standing to whom by 1975 she had been married for a quarter of a century and whose children she had raised. Nothing about her expense-sharing arrangement with J.R. indicates any consequent diminution in her need for support.

The provision that neither Bell nor Mrs. Bell would interfere with the other's liberty to lead his or her life free of restraint is plainly inconsistent with any effort by Bell to control her life-style. That life-style was for her to determine, free from his coercion. It may well be that her avoidance of further legally binding marital commitments in some degree was and is based on her earlier experience with marriage. In any event, the provision (for noninterference) leads us to interpret the disputed language as calling for a cessation of alimony only upon remarriage or in circumstances so closely like marriage as to result in Mrs. Bell acquiring significant actual support or a new right to support from a man prior to the specified date in 1981. Obviously Bell (who has remarried) was under no economic coercion, based on the separation agreement, not to remarry or even to refrain from less binding arrangements. On the other

hand, the threat or fear of loss of alimony could well be coercive of the arrangements made by Mrs. Bell.[6]

3. In our opinion, the probate judge was clearly in error (both on the evidence and on his own subsidiary findings) in certain of his conclusions and rulings.

(a) We regard as without basis in his subsidiary findings or in the evidence the judge's conclusions that Mrs. Bell was receiving "a measure of support" from J.R. The judge had found that, although J.R. alone paid the apartment rent of $450 per month and some utility expenses, Mrs. Bell purchased all the food and did most of the cooking and cleaning. With food costs current since the date of the agreement, it appears from the evidence that Mrs. Bell was contributing approximately as much as J.R. toward their joint living costs. If it be relevant, precise or even substantial equality of sharing expenses could not be expected reasonably in such an informal situation even from a woman apparently determined (as the evidence strongly suggests) to pay her own way in a relationship which involved no permanent commitment or ceremonial marriage.

(b) We think it immaterial whether persons who did not know her may have thought that Mrs. Bell was married to J.R. It was not a matter with which strangers reasonably should have concern.[7] This is an era when, as various decisions indicate (see the cases cited in note 9, infra), we are compelled to recognize that, for a variety of reasons, a significant number of couples will and do live together without the benefits and burdens of ceremonial marriage. The circumstances of Mrs. Bell's unobtrusive and inconspicuous ex-

---

[6] Questions of policy, perhaps strengthened by the Equal Rights Amendment (art. 1 of the Declaration of Rights of the Massachusetts Constitution as amended by art. 106 of the Amendments [1976]) may set limits on the use by a spouse of undue financial or other pressure to impose a given life pattern upon the other spouse after termination of the marital relationship. Such questions do not arise on the interpretation of the disputed language here adopted.

[7] The probate judge's conclusion that the disputed language relates to the "objective nature of the relationship and does not depend on whether . . . third persons are led to believe in the existence of a ceremonial mar-

pense-sharing arrangement in the substantial anonymity of urban apartment life cannot be appraised reasonably by what strangers would or may have thought about it.[8]

As stated above, there was no evidence whatsoever that Mrs. Bell ever held herself out as J.R.'s wife to any person (whether or not they knew her). See *Northrup* v. *Northrup*, 43 N.Y. 2d 566, 570-573 (1978). Compare *O'Connor Bros. Abalone Co.* v. *Brando*, 40 Cal. App. 3d 90, 95 (1974). Contrast *Lang* v. *Superior Court*, 53 Cal. App. 3d 852, 856-861 (1975), which viewed the statute there discussed as involving "holding out" to the general public and not merely to persons who knew the couple. The *Northrup* case is based largely upon the provisions of a pertinent New York statute, N.Y. Dom. Rel. Law § 248 (see now McKinney 1977). Whether, however, there is "holding out" by a woman that she is married, to persons having an interest in inquiring about her status (or at least in fact inquiring), may be, in our opinion, a consideration in determining whether there exists the outward appearance of marriage.[9]

In the light of the foregoing discussion and of our interpretation of the disputed language, we perceive on this record no basis for the termination of Mrs. Bell's alimony.

---

riage" may be internally inconsistent. It, however, tends to recognize that it is irrelevant what strangers to Mrs. Bell and J.R. may think on the subject.

[8] The probate judge interpreted the disputed language "as intended to prevent the elimination of alimony in the event that . . . [Mrs. Bell] subsequent to her divorce, lived with a relative or took in a boarder" or "in the event . . . [she] lived with another man for a short or insubstantial period of time, as opposed to a protracted period of time." We reject this interpretation. It implies the unlikely intention that, although there would be no cessation of alimony if she engaged in brief, casual, or promiscuous affairs, alimony must cease if she participates in a more stable, more sedate, and longer expense-sharing arrangement.

[9] See other New York decisions, e.g., *Stern* v. *Stern*, 88 Misc. 2d 860, 864 (N.Y. Sup. Ct. 1976); *Citron* v. *Citron*, 91 Misc. 2d 785, 788 (N.Y. Sup. Ct. 1977). See also *Levine* v. *Levine*, 79 Misc. 2d 149, 151 (N.Y. Sup. Ct. 1973). Compare *Lang* v. *Superior Court*, 53 Cal. App. 3d at 861.

4. The judgment is reversed and the case is remanded to the Probate Court for further proceedings consistent with this opinion. We think (essentially as did the probate judge) that this is a case in which costs in the trial court and on appeal should be shared evenly and in which each party should bear the reasonable counsel fees incurred by him or her.

*So ordered.*


HALE, C.J. (dissenting). In my view the majority ignore the plain language of the agreement. The plaintiff by living with J.R. in what the judge found to be "a permanent and enduring relationship" and by socializing, eating meals, taking trips, and attending functions with J.R. was "living together with a member of the opposite sex, so as to give the outward appearance of marriage." The majority place heavy emphasis on the amount of support received by Mrs. Bell and conclude that the disputed clause would not operate to terminate her right to alimony unless she became entitled to receive support from a man (part 1 of the majority opinion leaves unclear just how that can be accomplished without a marriage) or acquired "significant actual support" from a man. While arrangements for support might in some cases be a factor to consider in determining whether there was an "outward appearance of marriage," in the typical case, the arrangement for support or the payment of expenses would be a private matter having little bearing on outward appearances. There is no evidence in the record before us that they were treated otherwise by Mrs. Bell and J.R.

In the instant case, all of the critical factors of a marital relationship were present. While Mrs. Bell may have carefully avoided representing that she was married to J.R., she enjoyed what was essentially a marital type relationship with him. She cannot now avoid the financial consequences of those actions by relying on factors such as the main-

tenance of a separate mailing address or the failure to sign the lease, which did not affect the basic character of their relationship. The avoidance of a change of name by Mrs. Bell, the couple's non-use of "Mr. and Mrs.," and their use of separate bank accounts are practices followed by many married couples. If such formalities are to be given the effect of precluding, as matter of law, a finding that Mrs. Bell's living arrangement gave the outward appearance of marriage, the clause in question — not uncommon in separation agreements — will as a practical matter be nullified.