ANNE C. BELL *vs.* LOWRY M. BELL, JR.

Norfolk. January 11, 1984. — September 13, 1984.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Divorce and Separation,* Separation agreement, Alimony. *Contract,* Separation agreement. *Public Policy.*

Under the terms of a separation agreement providing that the husband's obligation to make monthly alimony payments would terminate in the event of the wife's "living together with a member of the opposite sex, so as to give the outward appearance of marriage," the husband's obligation to pay alimony was terminated by the wife's living in a one-bedroom apartment with a man on a regular basis for approximately three years, even though the wife and the man never held themselves out as being married. [23-24] WILKINS, J., with whom LIACOS and ABRAMS, JJ., join, dissenting; ABRAMS, J., dissenting.

LIBEL for divorce filed in the Probate Court for the county of Norfolk on October 22, 1974.

A complaint for contempt filed April 8, 1981, was heard by *David H. Kopelman, J.*

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Charles J. Humphreys (Roberta F. Sawyer* with him) for the defendant.

*Monroe L. Inker* for the plaintiff.

O'CONNOR, J. The plaintiff appealed to the Appeals Court from the dismissal of her contempt complaint against her former husband for his failure to continue support payments allegedly owed to her under a judgment of divorce. The Appeals Court, by a two-to-one decision, reversed the judgment of the Probate Court. *Bell* v. *Bell,* 16 Mass. App. Ct. 188, 197 (1983). We granted the defendant's application for further appellate review. We affirm the judgment of the Probate Court.

The judgment of divorce was entered on April 28, 1976, effective as of November 28, 1975. It incorporated a separation

agreement that provided in part that the defendant would make significant monthly alimony payments to the plaintiff for a period of fifteen years following the entry of a final judgment of divorce or until the "happening of the following contingencies: 1) the [w]ife's death, 2) the [w]ife's remarriage, and/or 3) [the w]ife's living together with a member of the opposite sex, so as to give the outward appearance of marriage at any time prior to May 1, 1981, whichever of the . . . three contingencies happens first." The controversy concerns the interpretation and application of the third contingency provision (cohabitation clause). After a trial of the contempt matter, the judge made written findings and rulings. Based on his subsidiary findings with respect to the conduct of the plaintiff, we conclude that she "liv[ed] together with a member of the opposite sex, so as to give the outward appearance of marriage . . . prior to May 1, 1981."[1] It follows that the judge correctly ruled that the defendant's obligation to pay alimony had terminated and the contempt complaint was properly dismissed.

The judge found that following the judgment of divorce the plaintiff resided at the marital home in Cohasset on a regular basis until March, 1978. From March, 1978, until that summer she resided part of the time at the Cohasset home and part of the time in an apartment leased by a man identified as "J.R." From June, 1978, through October, 1979, she resided on a regular basis with J.R. in his apartment, and from October, 1979, to June, 1980, she resided with him at his apartment "for the most part." The judge also found that "[d]uring the period of time from June, 1978 through May, 1981, the plaintiff on a regular basis cohabited with J.R. . . . during which time they shared the same bedroom."

In addition, the judge made numerous detailed findings which we summarize briefly. The apartment lease stood solely in J.R.'s name. The plaintiff's name did not appear on the door or on the mailbox and she received her mail elsewhere.

---

[1] We consider the cohabitation clause to be unambiguous as applied to the facts of this case, and therefore we do not rely on parol evidence or on findings of the judge to determine the intent of the parties.

J.R. paid the rent and the plaintiff purchased the food and did most of the cooking and cleaning. Part of the furniture in the apartment was his and part of it was hers. They maintained separate bank accounts and never commingled assets. They took trips together and divided the costs. They socialized together. The plaintiff never represented to anyone that she was married to J.R. She never used his surname.

The cohabitation clause in question allowed the termination of alimony payments in the event that the plaintiff lived with a man "so as to give the outward appearance of marriage." It focused on the possibility of the plaintiff's sharing a home with a man, and it contemplated that that might occur in either of two ways: in a way that would create the appearance that the plaintiff and the man were married, or in a way that would not create such an appearance. Clearly, the parties thought that a man and a woman could live together in a way that would normally be associated with being married without their actually being married and without claiming or acknowledging a marriage relationship. It is difficult to conceive of what conduct the parties contemplated if that conduct did not at least include the plaintiff's sharing a bedroom with a man on a regular basis for approximately three years.

The Appeals Court held that it was the intention of the parties that alimony might be terminated only on the death or remarriage of the plaintiff, or "in circumstances so closely like marriage as to result in Mrs. Bell acquiring significant actual support or a new right to support from a man prior to the specified date in 1981." *Bell* v. *Bell, supra* at 194. The Appeals Court correctly noted that, in the absence of a formally solemnized marriage, the plaintiff could not become entitled to support from a man except by a contract providing for it. *Id.* at 192-193. Thus, in effect, the Appeals Court interpreted the separation agreement to provide for the termination of alimony in less than fifteen years only if the plaintiff died or remarried or, irrespective of appearances, if she actually received significant financial support from a man other than the defendant, or entered into a contract for support.

The plain language of the agreement cannot properly be ignored. The clause in question does not mention support or the plaintiff's continuing need for it in the absence of a new source. It would have been relatively easy for the parties to have expressly provided for the termination of alimony in the event of the plaintiff's being substantially supported by another man or becoming contractually entitled to such support. There was no need to subtly express that thought by a reference to the plaintiff's living with a man so as to give the outward appearance of marriage. The language is better suited, and we think was employed, to provide for termination of the plaintiff's right to alimony if she were to remarry or were to live as though she were remarried.

In arriving at its interpretation of the cohabitation clause as relieving the defendant of his alimony obligation only if the plaintiff were to receive substantial support or were to become contractually entitled to receive support from another man, the Appeals Court relied in part on a provision in the separation agreement that "neither the [h]usband nor the [w]ife will hereafter interfere with the personal liberty of the other, and each may lead his or her life free from any criticism or restraint by the other." *Bell* v. *Bell, supra* at 194. The court reasoned that, if the defendant were entitled to terminate alimony payments in response to the plaintiff's arrangement with J.R., the defendant could coerce the plaintiff's conduct in a way that was inconsistent with the intent of the parties as expressed in their agreement. *Id.* at 194-195. It is true that the disputed clause, as we interpret it, might give the plaintiff reason not to live with a man so as to give the outward appearance of marriage. It is also true that the provision permitting a termination of alimony in the event of the plaintiff's remarriage might give her reason to decide against remarriage. We think, however, that it is clear that the parties did not intend by the noninterference provision to preclude the defendant from possibly influencing the plaintiff's choices by terminating alimony payments in the event she were to remarry or were to live with a man in the manner of a married couple. Termination of alimony payments in such circumstances cannot be considered interfer-

ence with the plaintiff's personal liberty or "criticism or restraint" within the meaning of the agreement.

Finally, the plaintiff argues that "[c]ohabitation clauses which operate to bar the receipt of support payments by the wife upon the commencement of a non-marital relationship with a man, unfairly discriminate against women, both pursuant to the equal protection clause of the United States Constitution and the Massachusetts Equal Rights Amendment." The plaintiff's argument challenging the constitutionality of the provision appears for the first time on appeal to this court. Because this argument was not raised below, we decline to consider it. See *M.H. Gordon & Son* v. *Alcoholic Beverages Control Comm'n*, 386 Mass. 64, 73 (1982); *Trimmer, petitioner*, 375 Mass. 588, 592 (1978).

*Judgment of the Probate Court affirmed.*

WILKINS, J. (dissenting, with whom Liacos and Abrams, JJ., join). The opinion of the Appeals Court presents a reasonable interpretation of the separation agreement, certainly a view preferable to that expressed in the opinion of this court. The court's opinion gives no effect to the provision in the separation agreement that neither party will "interfere with the personal liberty of the other, and each may lead his or her life free from any criticism or restraint of the other." We would reverse the judgment of the trial court by focusing on the crucial language of the separation agreement, and would thus ignore the details of the private arrangement between Mrs. Bell and J.R. that have influenced the opinion of this court and the majority and dissenting opinions of the Justices of the Appeals Court.

The question for decision is what the parties meant by the phrase "(3) [the w]ife's living together with a member of the opposite sex, so as to give the outward appearance of marriage at any time prior to May 1, 1981. . . ." We know that the wife's living with a man would not alone terminate the husband's alimony obligation. The living together must have the appearance of marriage and that appearance must be outward.

The court is wrong, therefore, in relying exclusively on the fact of "[Mrs. Bell's] sharing a bedroom with [J.R.] on a regular basis for approximately three years." *Ante* at 22. That fact presents no outward appearance of anything. It was a private matter.

The significant point is that all the facts concerning the conduct and relationship of the wife and J.R. are equally consistent with a couple's not being married as they are with a couple's being married.[1] Couples, married and unmarried, share or do not share living and travel expenses when they live together. In today's society, for better or for worse, unmarried couples live together and, from that fact alone, no conclusion can fairly be drawn that such couples are married or that they give the outward appearance of marriage. The fact of sharing a bedroom over a period of time is thus inconclusive on the question of an outward appearance of marriage.

The disputed language would apply, however, if Mrs. Bell were to have held herself out as married to J.R. That fact would have given the outward appearance of marriage. The facts in this case incontestably show that Mrs. Bell made no such representation. It is not for us to apply our moral judgment to conclude that the sharing of a bedroom over a period of time should be treated as giving an outward appearance of marriage when in fact, in today's world, such a sharing of a bedroom gives no such appearance.


ABRAMS, J., (dissenting). I cannot share the court's certitude that the plaintiff and her former husband agreed that his obligation to pay alimony would terminate if she shared a bedroom with another man "on a regular basis." *Ante* at 21. A separation

---

[1] There is one fact which, if true, might indicate that Mrs. Bell and J.R. did not give the outward appearance of marriage. She testified that, during the entire time she had known J.R., she had dated other men and that she and J.R. had no arrangement by which she could not go out with other men. The opinion of the court ignores both this testimony concerning outward conduct and the trial judge's failure to consider it. The trial judge simply found that "on rare occasions [Mrs. Bell] brought someone other than J.R. to . . . cocktail parties" at J.R.'s apartment.

agreement incorporated in a judgment of divorce is not an ordinary contract, but a judicially sanctioned contract setting forth the allocation between former spouses of rights, responsibilities, and resources. Although wives today may be less economically dependent on their husbands than was the case in the past, it remains true that the typical alimony recipient is a woman who has sacrificed her earning capacity to her marriage and who, as an equitable and practical matter, must look to her former husband for financial support following a separation or divorce. Such women have little bargaining power and to a large extent must rely on judicial supervision to ensure that their entitlement to support is not made contingent on unjust and unreasonable conditions. See *Knox* v. *Remick*, 371 Mass. 433, 436-437 (1976). By giving its imprimatur to an interpretation of the Bell's separation agreement that hinges the plaintiff's entitlement to support on her conformity to life-style requirements imposed by the defendant, the court encourages economically-dominant husbands to meddle arbitrarily with the postdivorce lives of their wives, and thereby sends an unfortunate message to probate judges charged with scrutinizing such separate agreements to ensure that the agreements are "fair and reasonable." *Knox* v. *Remick, supra* at 436.

To be sure, there is nothing unreasonable about provisions allowing the defendant and others similarly situated to discontinue support payments in circumstances where the recipient's need is eliminated or met by another source. As construed by the court, the separation agreement and divorce judgment terminated the plaintiff's right to support solely because of her involvement in a relationship that does not have the defendant's approval, without any inquiry into its effect on her need for support and without reciprocal restraint on her husband.

Such a purely punitive elimination of support cannot be reconciled with the agreement's guarantee that "each [spouse] may lead his or her life free from any . . . restraint by the other." But even if, as the court decides, the unjustified limitation on the plaintiff's personal life imposed by a cutoff of support in the circumstances of this case is not plainly inconsistent with the terms of the Bells' agreement, public policy

considerations should operate to preclude the result reached by the court. It is well established that a contractual restraint on fundamental private rights is subversive of public policy if it is "more onerous in its nature than is reasonably necessary for the proper fulfillment" of its purposes. *Gleason* v. *Mann*, 312 Mass. 420, 423-424, 425 (1942) (agreement that bound woman "to live a life of celibacy" unenforceable on public policy grounds where obligation "could be of no benefit" to employer). Compare *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 102-103 (1979). By interpreting and enforcing the clause at issue here so as to give judicial sanction to a termination of support, the court allies itself with alimony payors who exercise their economic power in a manner that unreasonably interferes with the private, autonomous lives of the spouse from whom they have been divorced. I dissent.