ROBERT A. PALMER *vs.* JUDITH A. PALMER.

No. 88-P-508.

Norfolk. February 17, 1989. — March 21, 1989.

Present: PERRETTA, KAPLAN, & KASS, JJ.

*Divorce and Separation*, Separation agreement, Alimony, Modification of judgment. *Contract*, Separation agreement. *Public Policy. Evidence*, Offer of proof, Cohabitation. *Words*, "Cohabitation."

A divorced husband did not sustain his burden of proving by a preponderance of the evidence that his former wife's conduct constituted "cohabitation" with another man, so as to entitle him to terminate alimony payments by reason of a so-called cohabitation clause in the parties' separation agreement. [147-148]

In the absence of an offer of proof, no appellate issue was preserved with respect to the exclusion of certain evidence offered for impeachment of a witness at a hearing on the modification of a divorce judgment. [147-149]

COMPLAINT for divorce filed in the Norfolk Division of the Probate and Family Court Department on April 5, 1984.

A complaint for modification, filed on December 11, 1986, was heard by *George N. Asack*, J. ·

*Nancy R. Van Tine* for Robert A. Palmer.

*Terrance J. McCarthy* for Judith A. Palmer.

KAPLAN, J. A judge of the Probate Court found a lack of evidence that the divorced wife (defendant) "cohabited" with a man in the sense of a clause in a separation agreement incorporated in the divorce judgment. Had she so "cohabited," the former husband would be entitled under the agreement to alter and later to terminate alimony payments. Disputing the finding, the plaintiff husband appeals.

1. Before detailing the facts relevant to this appeal, we mention a pair of decided cases which furnish necessary legal background. In *Bell* v. *Bell*, 16 Mass. App. Ct. 188 (1983) (2-1 decision), overruled at 393 Mass. 20 (1984) (4-3 decision),

cert. denied, 470 U.S. 1027 (1985), the separation agreement obliged the husband to make monthly alimony payments over a period of fifteen years following final judgment of divorce, entered April 28, 1976, but the obligation was to cease upon the wife's death, her remarriage, or her "living together with a member of the opposite sex, so as to give the outward appearance of marriage at any time prior to May 1, 1981." There was proof that the wife and a man, J. R., had had an enduring relationship during the specified period: they shared living quarters and, as a couple, ate meals, took trips, and socialized, giving parties and attending parties and other social functions and entertainments. However, the wife used her separate name; there was no commingling of funds or any joint bank account; and there was such a more-or-less equal division of living expenses (rent, food, etc.) that neither party could be said to have assisted in the other's support.

On these facts (omitting other details) the Probate Court held that the wife forfeited alimony; she failed in her application to hold the husband in civil contempt for nonpayment. Our court reversed, holding in substance that the quoted clause was related primarily to the question of support. In case of remarriage, the husband was relieved of alimony, presumably because the other man was legally bound to furnish support; where there was a living together, although without a formal remarriage, the result should be the same if the other man actually furnished support to the woman (or the woman supported him). There was no such situation of support in *Bell*. One Justice dissented, stating in effect that it was enough under the clause that the parties lived together largely as married couples do; the economics of the case was not a significant factor.

A majority of the Supreme Judicial Court adopted the latter view. The plain language of the agreement, they said, could not be ignored. It did not mention support or the wife's continuing need for it. Alimony was lost when the wife lived as if she were remarried. A further provision of the agreement — that "neither the [h]usband nor the [w]ife will hereafter interfere with the personal liberty of the other, and each may lead his

or her life free from any criticism or restraint by the other" — did not serve to change the result even though the cohabitation clause, as interpreted, might constrain the wife's liberty by operating to influence her against that style of life (just as it might inhibit her remarrying).

The dissenting opinion for the three Justices laid particular stress on the "appearance" language of the clause: where the parties, although sharing living quarters and so on, did not hold themselves out as married or pretend that they were, then, in today's world of manners, they would give no appearance of marriage to any persons likely to be at all interested in the question. The opinion urged also that the majority's position was inconsistent with the noninterference provision of the *Bell* agreement.

In a separate opinion, one of the dissenting Justices pointed out that separation agreements made part of divorce judgments are contracts judicially approved. The majority's interpretation of the *Bell* clause impliedly indicated to judges at the trial level that they could accept agreements by which husbands with superior financial power might meddle arbitrarily with the post-divorce behavior of their former wives. The living together should figure only in the respect that it had a bearing on the wife's need for support. If given other significance, the clause, besides being inconsistent with the "non-interference" provision, should be held offensive to public policy.[1]

*Gottsegen* v. *Gottsegen*, 397 Mass. 617 (1986) (4-1 decision) reached the Supreme Judicial Court two years later on transfer from our court. There the separation agreement required the husband to pay the wife $812.50 per month for her support, but, if the wife should remarry within five years, the obligation became one to pay $30,000 at the rate of $833.33 per month for three years. "Remarriage" was "deemed" to include the wife's "cohabitation with the same unrelated man with whom the wife has a romantic relationship for more than two . . .

---

[1] Possible constitutional problems were alluded to but not made a basis of decision in the majority opinion in our court; on review, constitutional questions were pretermitted because not raised by the wife below.

consecutive months." We may take it that the facts of the post-divorce relationship between the wife and L. W. in the *Gottsegen* case resembled those in the *Bell* case. A probate judge held that the cohabitation clause had gone into effect. Upon review, four Justices voted to reverse. They found a distinction from the *Bell* case. In *Bell,* the clause, like the rest of the separation agreement, although incorporated in the divorce judgment, was not merged in it; the judgment, following the agreement, stated that the "[a]greement shall survive this judgment and have independent significance." To the contrary, in *Gottsegen,* the clause, as part of art. III of the agreement regarding financial arrangements for the wife, was agreed to be merged in the judgment, with the rest of the agreement surviving as an independent contract.[2] To the extent of the merger, the terms of the agreement carried into the court's judgment must be such as the court would have power to adopt in the absence of agreement. But the power of the court to grant (and modify) alimony, as fixed by statute, see G. L. c. 208, §§ 34, 37, extends to support and nothing more; thus any provision of a merged agreement that conditioned support on an extraneous circumstance (here cohabitation without regard to needed support for the wife) was beyond the court's competence to approve or enforce.[3] Under the facts, there was no change of circumstances regarding the wife's need for support that might justify a modification of the judgment, and so she could maintain her complaint for civil contempt against the husband based on his revising his alimony payments in (mistaken) reliance on the cohabitation clause.[4]

A short concurring opinion emphasized that the *Bell* principle was not affected. On the other hand, the dissenting Justice believed the majority were implicitly overruling *Bell.* The fact

---

[2] As to merger and survival of separation agreements, see *Knox* v. *Remick,* 371 Mass. 433 (1976); *DeChristofaro* v. *DeChristofaro,* 24 Mass. App. Ct. 231 (1987).

[3] For a statement anticipating this point, see *Levine* v. *Levine,* 394 Mass. 749, 752 n.2 (1985).

[4] Constitutional questions were not considered as they had not been raised below.

that the *Bell* agreement survived the divorce judgment had not even been mentioned in the opinion of the four Justices on the *Bell* appeal: a separation agreement requires judicial approval even when it survives the judgment, so it should make no difference of substance here whether the agreement was merged or was stated to be independent.

2. We turn to the facts of the present case. Robert and Judith Palmer, husband and wife, lived apart after February, 1984. The wife petitioned for divorce, and on November 18, 1985, a judgment nisi entered, becoming final on February 18, 1986. The judgment stated that a separation agreement, also dated November 18, 1985, was "incorporated and not merged in this [j]udgment but nevertheless [was] to survive and have independent significance." The agreement, after certain property dispositions, obliged the husband to pay $850 per week as unallocated alimony and child support. The weekly obligation was to fall to $700 when the youngest of the three children of the marriage became emancipated; to $650 after six years; and to $500 when the husband attained the age of 65. To the extent the wife earned income in excess of $12,000 in any year, alimony was to be reduced "dollar for dollar." Alimony would end altogether upon the wife's "death, remarriage, cohabitation for a period exceeding 30 days or the appearance of cohabitation." Under the caption "Living Separate," the separation agreement provided that "[i]t will be lawful for the wife . . . to live separate and apart . . . , free from any restraint or interference, direct or indirect, by the husband, as if she were sole and unmarried."[5]

On December 11, 1986, the husband petitioned for modification of the judgment alleging that (i) the wife stood in breach of the cohabitation clause quoted above, and (ii) at all events she was earning in excess of the $12,000.

After trial, the judge found against the husband on both points.[6] The husband quarrels with the former determination.

---

[5] There was reciprocal provision for the husband.

[6] It is agreed that emancipation of the youngest child has occurred, reducing weekly payments to $700. The judgment reflects this fact.

The principal witness for the husband was Lawrence J. Curtin, a private investigator whom he had retained. About March 24, 1986, a month after the divorce judgment became final, Curtin commenced a surveillance of the wife's house at 179 Cedar Street, Braintree. His general method was to spot, from behind the outer four-foot fieldstone wall of the premises, what cars were parked in the driveway shortly after midnight and again around seven o'clock the following morning. The substance of his testimony (omitting details) was that on various dates a Mercedes or Mitsubishi automobile (with repair license plates), used by a man, J. S., and a Corvette, used by the wife, were parked at both of the indicated hours. In summary — the count cannot be exact on the present record — observations with these results were made several times in March, six or seven times in April, five in May, fourteen in June, eight in July, seven in August. On many of these occasions, Curtin saw J. S. departing from the house at the morning hour. Curtin saw the wife and J. S. together outside the house on the afternoon of March 24 when he made a pretense of asking them for directions, and on one evening in June he observed the pair leave the house, dine at a restaurant, and return to the house. (Apparently it was only on these two occasions that Curtin saw the wife.) One day, Curtin saw J. S. using a key to enter the house.

A daughter, aged twenty-three, testified on her father's behalf. She said J. S. had presumed, like a host, to make her welcome at a family Thanksgiving gathering at the house, and she spoke of her mother and J. S. once "hugging and kissing" and retiring upstairs. When she telephoned to talk to her mother, J. S. sometimes answered the phone. It appeared that the daughter had moved out of the house at her mother's instance in March, 1985. Now she was living with her father and was employed by him. It was she who had purloined her mother's diary; see point 4 below.

The defendant Judith Palmer was called as a hostile witness. She said she was "dating" J. S. on a regular basis from March to September, 1986. He had stayed over at the house on various occasions without routine or pattern, most often, apparently,

sharing a bedroom with her. Questioned about the number of these visits, she could not be definite, she had not kept count. She had sometimes given J. S. a key to the house. She had lent J. S. $16,000 to purchase certain equipment, and he had repaid the loan in six months without interest. Cross-examination indicated that J. S. was married; he maintained his own place, at the time of the trial an apartment at the Spanish Terrace Apartments in Weymouth. The defendant had never received money from J. S., whether for food or clothing or anything else. She said, and reiterated, that she had not been living with J. S.

3. As befits an intermediate appellate court, in the condition of the law described above, we pass by the remarks of the dissenting Justice in *Gottsegen* and assume that the *Bell* case, as decided by the Supreme Judicial Court, remains our rule of decision.[7] Thus the unmerged, independent separation agreement between the Palmers, including its cohabitation clause, applies and should be enforced according to its terms. Evidently the probate judge went on the same assumption. Thus if the wife herein cohabited with J. S., or gave that appearance, she forfeits all alimony.

We have first to say what "cohabitation" means. The core meaning of the word is a living together as a married couple customarily do; the main opinion in *Bell*, 393 Mass. at 21, uses "cohabitation" and "living together" synonymously. This meaning is confirmed by the Oxford English Dictionary (1st ed. 1933 & Supp. 1972) which defines "cohabit" thus: "To live together as husband and wife: often said distinctively of

---

[7] Room can still be found for the *Bell* decision despite the ruling in *Bush* v. *Bush*, 402 Mass. 406 (1988), that, under a divorce judgment granting alimony to the wife, no separation agreement being involved, her subsequent "cohabitation" had no effect on the alimony obligation where her need for support continued. There is considerable authority to the same effect — applying an "economic needs test" — in other jurisdictions. See *Mitchell* v. *Mitchell*, 418 A.2d 1140, 1143 (Me. 1980); *Gayet* v. *Gayet*, 92 N.J. 149, 154 (1983); *Ramsbottom* v. *Ramsbottom*, 542 A.2d 1098, 1101 (R.I. 1988). See also 2 Clark, Law of Domestic Relations in the United States § 17.6, at 285-290 (2d ed. 1987); Annotations, 98 A.L.R.3d 453, § 5 (1980); 47 A.L.R.4th 38, § 6 (1986).

persons not legally married." Several lesser dictionaries cited by the judge or examined by us yield the same meaning in substance.

Was there cohabitation in fact? We have been at pains to describe the situation in *Bell* and again in the instant case. The contrast is marked. In *Bell* the couple were sharing the experiences of living in a comprehensive way. In the present case there is evidence only of "dating," as the wife put it in her testimony, and that picture is not altered significantly for the present purpose if it be accepted that there were repeated sexual encounters. Dating invokes the "Living Separate" provision rather than the cohabitation clause. As to "appearance" of cohabitation, the facts here support no such characterization.

We have given our own appreciation of the facts, but more properly the question under Mass.R.Dom.Rel.P. 52(a) (1975) is whether the judge's similar view of the facts can be said to be "clearly erroneous." It cannot be. The judge wrote in part: "Although the parties were not married and there may have been a sexual relationship in that he stayed overnight sporadically, there is insufficient evidence that they lived together as husband and wife, or that he spent the majority of time at the [d]efendant's home.. He maintained his home at Spanish Terrace Apartments in Weymouth. . . . The burden of proving by a preponderance of the evidence that there was 'cohabitation for a period exceeding 30 days or the appearance of cohabitation' has not been met."

4. Testifying as a hostile witness, the defendant wife, who had heard Curtin's testimony, was still indefinite about the number of J. S.'s visits at the house. When pressed, say as to June, 1986, she said there were not many visits, maybe five, not as many as ten. By way of impeachment, plaintiff's counsel wanted to confront the defendant with the contents of her diary, which, as it now appeared, had been spirited out of the house by the daughter (it had been reported to the police as stolen). The judge indicated he would not permit the purloined diary to be so used.[8] Plaintiff's counsel said (overheatedly) that she

[8] The judge's reaction to intra-family theft is understandable, but forbidding use of the diary for impeachment runs athwart a general proposition

would show the defendant had "perjured" herself, that in June there were visits, and intercourse, night after night. The judge said he would not allow counsel to give testimony about the contents of the diary "through the back door." The judge said: "I want you to reserve your rights." Despite this invitation to make a proper offer of proof, which could well have been done by tendering the diary for identification, counsel did nothing. We think any appellate point was lost by the failure to make such an offer of proof,[9] but, if counsel is taken at her word, and the diary, at variance with the wife's testimony, tells of visits night after night in June, the case is not altered. The failure of proof as to cohabitation, in the sense of the agreement and judgment, would remain.

*Judgment affirmed.*

---

that material secured illegally, but without connivance of the State, may be received in evidence. See *Commonwealth* v. *Richmond*, 379 Mass. 557, 561-562 (1980).

[9] This was not a case where, as during cross-examination, counsel can do no more than make an hypothesized general offer, because he cannot know, or know precisely, how the witness would respond. Cf. *Commonwealth* v. *Barnett*, 371 Mass. 87, 95 (1976).