1997 ND 135

**LaRue A. BAKER, Plaintiff and Appellee,**

v.

**Ralph R. BAKER, Defendant and Appellant.**

**Civil No. 960333.**

Supreme Court of North Dakota.

July 17, 1997.

---

Carol Ronning Kapsner (argued), of Kapsner & Kapsner, Bismarck, for plaintiff and appellee.

Rauleigh D. Robinson (argued), Bismarck, for defendant and appellant.

MESCHKE, Justice.

[¶ 1] Ralph R. Baker appealed an amendment to a divorce decree ending LaRue A. Baker's conditional duty to pay him $300 monthly spousal support because he was "cohabiting in an informal marital relationship." We affirm the trial court's finding that Ralph's cohabitation invoked the decree's condition, and we therefore affirm the amended decree.

[¶ 2] Ralph and LaRue married in 1963 and raised two children who were adults when LaRue sought a divorce in 1992. In granting the divorce, the trial court said the "marriage was dysfunctional almost from its inception."

[¶ 3] When divorced, Ralph was 49 years old, had an eighth grade education, and had been a heavy equipment operator. However, he had been injured during the late 1970s and has received permanent disability benefits from Social Security since then. Those benefits were expected to be nearly $1,200 per month by 1994.

[¶ 4] When divorced, LaRue was 50 years old and had been working for the United States Geological Survey for 30 years, earning near $38,000 per year. While employed, LaRue had obtained a four-year college education and had taken care of most of the homemaking responsibilities throughout their marriage.

[¶ 5] In the 1993 divorce, the trial court made no specific findings on the value of their marital property. Instead, the court allowed Ralph to divide the couple's personal belongings into two groups and allowed LaRue to select the group she wanted. The court awarded each spouse their individually held bank accounts, bonds, certificates of deposit, life insurance, and retirement accounts. The court rejected Ralph's request to get half of LaRue's retirement account

> because I do not think an equal division of property is equitable in this case, even though the marriage is of longstanding. The usual assumption is that the "homemaker" provides valuable services to the "breadwinner" and, in doing so, contributes to the increase in assets, along with any income the homemaker has contributed. [Ralph] has contributed his Social Security to the family finances, but has not functioned as a homemaker. [LaRue] has not only been employed full-time outside the home, but has pursued and obtained a college education and has done almost all of the homemaking duties.

The divorce court also ordered LaRue to pay Ralph $300 monthly for "permanent alimony":

> My conclusion is that an award of permanent alimony to [Ralph] of $300 a month will allow him to maintain his standard of living and even increase it, should he find a way to supplement his income even on a modest scale, and at the same time allow [LaRue] to maintain her standard of living although reducing the amount she might otherwise save for her retirement. The alimony will also serve the same function as would an equitable share for [Ralph] of [LaRue's] retirement income. Alimony will terminate upon [Ralph's] remarriage or should he cohabit in an informal marital relationship.

Neither spouse appealed the December 1993 divorce decree.

[¶ 6] In September 1996, after retirement of the trial judge who decreed the divorce,

LaRue moved to terminate spousal support, alleging Ralph "is now co-habiting with Sharon Mittleider." After trial, the new trial court found Ralph was "cohabiting in an informal marital relationship" with Mittleider and terminated spousal support. The trial court reasoned:

> [Ralph] lives in a mobile home in Bismarck. . . . Sharon Mittleider . . . has had a relationship with [him] for many years. She has a home in Steele . . . (approximately fifty miles from Bismarck). Mittleider stays overnight at [Ralph's] home three-fourths of the time. Mittleider has spent significant amounts of time at [Ralph's] home for at least the last fifteen months. She has had a key to the mobile home for two years. She comes and goes when she pleases with no control by [Ralph]. She is in the home at times [Ralph] is not present. Mittleider does not pay any bills for the mobile home, but does provide groceries on occasion. She keeps approximately 10 percent of her clothes at [Ralph's] home. Mittleider has a sexual relationship with [Ralph]. [He] and Mittleider exchange gifts on different occasions. [Ralph] has stayed overnight at Mittleider's house in Steele on occasion. Mittleider gets her mail in Steele, and has a telephone assigned to her in Steele. [Ralph] and Mittleider have traveled together out of state several times. On one trip Mittleider paid the bulk of the expenses, on other trips they shared the expenses. Mittleider gambles frequently. She uses her own money, and says she does not share her winnings with [Ralph]. [Ralph] expressed his desire to move to Montana. He said if he does so, Mittleider would be "going back to Steele."

\* \* \* \* \*

The evidence establishes an informal marital relationship. The only things lacking are a change in name, a marriage license, and a wedding. "If it looks like a duck . . ." There is no direct evidence of a financial contribution by Mittleider to [Ralph]. The Court finds it impossible to believe a relationship as described by [Ralph] and Mittleider in their own words could not include com[m]ingling of funds to

a much greater degree than admitted. If, in fact the finances of the two are indeed kept separate, it is only to prolong spousal support.

[Footnote omitted]. Ralph appealed the amended decree ending LaRue's obligation to pay him "permanent alimony."

 [¶ 7] Unfortunately, the term "permanent alimony" was loosely used by the trial judge in the original decree to describe LaRue's $300 monthly payment. Generally, we discourage use of the term "alimony" because, in divorce documentation, it connotes different concepts that serve different functions, spousal support and property division. *See Rustand v. Rustand,* 379 N.W.2d 806, 807 (N.D.1986). The distinctions between these concepts are important because, while courts have continuing power to modify spousal support, courts have no continuing power to modify a final property distribution. *See Rueckert v. Rueckert,* 499 N.W.2d 863, 867 (N.D.1993). Here, Ralph did not appeal this divorce decree nor move to clarify this aspect of the decree, *see Neubauer v. Neubauer,* 552 N.W.2d 793 (N.D.1996), and *Neubauer v. Neubauer,* 524 N.W.2d 593 (N.D. 1994), but now insists the trial court erred in terminating the $300 monthly payment because it combined spousal support and property division. *See Ramsdell v. Ramsdell,* 454 N.W.2d 522, 523 (N.D.1990) (if a regular payment is intended to be permanent as a part of property division, trial court cannot terminate it upon remarriage). Even if we were to review the original divorce decree de novo under these circumstances, *see Botner v. Botner,* 545 N.W.2d 188, 190 n. 2 (N.D. 1996), we would conclude the trial court correctly interpreted the $300 monthly payment as exclusively spousal support.

 [¶ 8] The attributes of spousal support, rather than property division, are indicated if the divorce payments are directed to be monthly, unsecured, and terminable upon designated events, like death or remarriage of the obligee. *See Redlin v. Redlin,* 436 N.W.2d 5, 8 (N.D.1989). On the other hand, a large, unexplained disparity in the property divided (apart from the periodic payments) signifies the payments may have been intended for property division. *Redlin.* Ap-

plied to this case, those factors evidence these $300 monthly payments were spousal support, not property division.

[¶ 9] These payments to Ralph were monthly, unsecured, and terminable if he should "die, remarry or cohabit in an informal marital relationship. . . ." Still, while the divorce court did not value the marital property before division, Ralph urges us to conclude there is a substantial disparity in the property division that shows the payments were intended to be property division.

[¶ 10] Even if the property division was disparate, however, the divorce court explained that disparity by saying an equal property division was not equitable because LaRue was not only employed full-time outside the home during the marriage, but she also obtained a college education while continuing to perform "almost all of the homemaking duties." The divorce court's added observation that "[t]he alimony will also serve the same function as would an equitable share for [Ralph] of [LaRue's] retirement income" does not make any part of the $300 payment into a property distribution when all other factors demonstrate the payment was intended as spousal support.

[¶ 11] Ralph asserts the trial court erred in ending his spousal support because the trial court's finding that he and Mittleider were cohabiting in an informal marital relationship is not supported by the evidence [1] and, in any event, "cohabiting in an informal marital relationship" is not a "recognized legal status" in North Dakota.

[¶ 12] We know of no law dictating that a condition to end spousal support must be a "recognized legal status." While unmarried cohabitants who separate cannot rely on the law requiring equitable division of marital property, see Kohler v. Flynn, 493 N.W.2d 647, 649 (N.D.1992), openly cohabiting without being married is nevertheless regulated by North Dakota law. See NDCC 12.1–20–10 (cohabiting "openly and notoriously with a person of the opposite sex as a married couple without being married to the other person" made a class B misdemeanor). Despite a near universal lack of prosecutorial enforcement of that kind of law, and even considering the shifting social mores of our era,[2] we are neither appalled nor surprised that cohabiting like husband and wife was made the functional equivalent of remarriage as a condition to end spousal support in this case.

---

**1.** NDCC 14–05–24 authorizes a court to modify spousal support when circumstances change significantly. *Wheeler v. Wheeler*, 548 N.W.2d 27, 30 (N.D.1996). Still, we prefer a trial court spell out preordained contingency limits of spousal support in a divorce decree rather than invite further litigation by unconditionally decreeing support for life. *See, e.g., Wiege v. Wiege*, 518 N.W.2d 708, 712 (N.D.1994). LaRue and Ralph did not enter into a settlement agreement that included the cohabitation contingency to be incorporated into the divorce decree. *See Addy v. Addy*, 456 N.W.2d 506, 507 (N.D.1990); *Fleck v. Fleck*, 337 N.W.2d 786, 788 (N.D.1983). Rather, this divorce court apparently imposed the cohabitation contingency on its own, as courts in this and other states have often done. *See Chinn v. Chinn*, 394 N.W.2d 692, 693 (N.D.1986); *In re Marriage of Gibson*, 320 N.W.2d 822, 823 (Iowa 1982). Even assuming he could do so after having failed to appeal from the original decree imposing the contingency, *see Neubauer*, 552 N.W.2d at 795, Ralph does not argue the cohabitation contingency is against public policy and therefore unenforceable.

We thus do not address an enforceability question that courts in other jurisdictions have confronted. *See, e.g., In re Marriage of Edwards*, 73 Or.App. 272, 698 P.2d 542, 545 (1985) (condition of automatic termination of spousal support for cohabitation by the supported spouse, if imposed by trial court rather than agreed to by the spouses, would be unenforceable); *Ramsbottom v. Ramsbottom*, 542 A.2d 1098, 1101 (R.I.1988) (same); *Alford v. Alford*, 594 So.2d 843, 844 (Fla.Ct.App.1992) (cohabitation clause in separation agreement does not violate public policy); *Spector v. Spector*, 112 Nev. 1395, 929 P.2d 964, 965 (1996) (same); 3 *Family Law Litigation Guide With Forms* § 33.03[7] (1996); Annot., *Divorced or separated spouse's living with member of opposite sex as affecting other spouse's obligation of alimony or support under separation agreement*, 47 A.L.R.4th 38 (1986), and cases collected therein.

**2.** According to the U.S. Bureau of the Census, Statistical Abstract of the United States: 1996 (116th ed.), Table Nos. 61 and 62, p. 56, there were 523,000 unmarried couples of the opposite sex sharing the same household in 1970 compared to 44,598,000 married couples living in this country. By 1995 the number of unmarried couples had increased more than 700 percent to 3,668,000 while the number of married couples increased barely 23 percent to 54,937,000.

[¶ 13] Nor do we see anything ambiguous in the trial court's implementation of a condition against "cohabit[ing] in an informal marital relationship." *Webster's Third New International Dictionary*, at p. 470 (1971), defines "cohabit" as "to live together as husband and wife usu. without a legal marriage having been performed." "Cohabitation" is similarly defined in *Black's Law Dictionary*, at p. 260 (6th ed. 1990), as "[t]o live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations." *See also State v. Hoffman*, 68 N.D. 610, 282 N.W. 407, 409 (1938) (under prior criminal law, "[t]o cohabit as husband and wife merely means to have intercourse with each other, the same as husband and wife," and "[i]f a man and woman live together in the same dwelling place, the same as husband and wife live together, so that from general knowledge they conduct themselves as husband and wife and cohabit as husband and wife, then they are living 'openly and notoriously' and are 'cohabiting' as husband and wife, and if at that time they are not married to each other, then they are guilty of unlawful cohabitation").

[¶ 14] Courts have employed a number of evidentiary factors to factually determine, for ending spousal support, whether two people are living together as husband and wife without being married. Cohabiting in an informal marital relationship is more than merely living together briefly or having sexual relations.[3] *See Frey v. Frey*, 14 Va.App. 270, 416 S.E.2d 40, 43 (1992); *Perri v. Perri*, 79 Ohio App.3d 845, 608 N.E.2d 790, 794 (1992). The details employed frequently by courts include establishment of a common residence; long-term sexual, intimate or romantic involvement; shared assets or common bank accounts; joint contribution to household expenses; and a recognition of the relationship by the community. *See Beck v. Beck*, 286 Ala. 692, 246 So.2d 420, 428 (1971); *In re Marriage of*

*Gibson*, 320 N.W.2d at 824; *Gordon v. Gordon*, 342 Md. 294, 675 A.2d 540, 547–548 (1996); *In re Marriage of Edwards*, 698 P.2d at 547; *Haddow v. Haddow*, 707 P.2d 669, 673 (Utah 1985); *Frey*, 416 S.E.2d at 43; Annot., 47 A.L.R.4th at 38, and cases collected therein. However, as *Gordon*, 675 A.2d at 547, explains, these factors are non-exclusive, and no one factor is an absolute prerequisite for a finding of cohabitation.

[¶ 15] For example, in *Perri*, 608 N.E.2d at 794, the court said the absence of a sexual relationship would not be dispositive because, "[a]s marriage partners may mutually consent to a cessation of a sexual relationship, or as age or illness may render its practice impossible, all without disturbing the obligations of the contract, so too may it be the case with cohabitation." In *Haddow*, 707 P.2d at 673, the court did not consider "the sharing of the financial obligations surrounding the maintenance of a household to be a requisite element of cohabitation...." And in *Frey*, 416 S.E.2d at 43, the court explained, "[a]lthough the trial court did properly consider contributing to financial support as a factor which tends to prove the assumption of duties or obligations attendant to marriage, other factors exclusive of support may be sufficient to establish that a relationship between parties is analogous to marriage." The court in *In re Marriage of Edwards*, 698 P.2d at 547, further explained:

> Although some economic consequence is inevitable from such a relationship, we decline to adopt wife's suggestion that financial benefit to the supported spouse that permanently affects the need for the decreed spousal support is a prerequisite to a finding of cohabitation. Cohabitation, like remarriage, may result in a decreased or increased standard of living and may endure for only a limited period, but those factors do not determine the existence of the underlying relationship.

*See also Bell v. Bell*, 393 Mass. 20, 468 N.E.2d 859, 861 (1984). As these decisions demonstrate, whether an arrangement con-

---

**3.** In *Ratajczak v. Ratajczak*, 1997 ND 122, 565 N.W.2d 491, we recently held that a spouse, who committed adultery after the couple separated but before the divorce, was not precluded, as a matter of law, from receiving spousal support, although it is conduct to be considered as a *Ruff–Fischer* factor in ordering spousal support.

stitutes "cohabitation" is particularly factual in nature and depends on the entire circumstances of each case.

[¶ 16] We believe the evidence supports the trial court's finding that Ralph and Mittleider were cohabiting in an informal marital relationship. They shared a common residence. Both acknowledged Mittleider stayed at Ralph's home in Bismarck three-fourths of the time. She has had a key to the home for two years while free to come and go as she pleased, staying there at times when he was not home. She prepared meals, kept some of her clothing there, and did laundry there. Ralph occasionally stayed overnight with Mittleider at her home in Steele, and they visited her lake cabin together. They also stayed together during vacations and social visits. They both contributed to household expenses. While Mittleider payed no bills associated with Ralph's home, she occasionally supplied groceries. Their relationship was sexual and relatively long-term, lasting at least 15 months before the trial court's decision.

[¶ 17] There was recognition of the relationship by the community. Ralph and Mittleider celebrated holidays together, visited their families and friends together, and attended social events together. Her car was parked outside Ralph's home "virtually every day."

[¶ 18] True, no evidence of shared or common bank accounts was given, and the trial court recognized the lack of direct evidence that Ralph and Mittleider commingled their funds. However, this was only one of many factors to consider. Furthermore, the trial court found their testimony about the lack of commingled funds "impossible to believe...."

[¶ 19] A finding of fact is clearly erroneous under NDRCivP 52(a) if it is induced by an erroneous view of the law, if there is no evidence to support it, or if there is some evidence for it, this court is left with a definite and firm conviction that a mistake has been made. *Reimer v. Reimer*, 502 N.W.2d 231, 234 (N.D.1993). We conclude the trial court's finding that Ralph and Mittleider were cohabiting in an informal marital relationship is not clearly erroneous.

[¶ 20] Ralph does not argue there are extraordinary circumstances justifying continuation of spousal support notwithstanding his cohabitation. *Compare Ramsdell*, 454 N.W.2d at 525 (where decree placed no terminating condition on payment of "alimony," court was "unwilling to rule that a former spouse's disability alone always compels continuation of support during another marriage"). We therefore conclude the trial court did not err in ending LaRue's spousal support to Ralph for the condition expressed in the divorce decree.

[¶ 21] We affirm the amended decree ending spousal support.

[¶ 22] VANDE WALLE, C.J., and SANDSTROM, NEUMANN and MARING, JJ., concur.

