2001 ND 81

**NORTH DAKOTA FAIR HOUSING COUNCIL, INC., Plaintiff and Appellant,**

**Robert Ray Kippen, and Patricia Yvonne Kippen, Plaintiffs,**

**v.**

**David PETERSON and Mary Peterson, Defendants and Appellees.**

**North Dakota Fair Housing Council, Inc., Plaintiff,**

**Robert Ray Kippen, and Patricia Yvonne Kippen, Plaintiffs and Appellants,**

**v.**

**David Peterson and Mary Peterson, Defendants and Appellees.**

**Nos. 20000130, 20000197.**

Supreme Court of North Dakota.

May 1, 2001.

Edwin W.F. Dyer III, Dyer & Summers, P.C., Bismarck, ND, and Christopher Brancart (argued), Brancart & Brancart, Pescadero, CA, for plaintiffs and appellants.

Jack G. Marcil (argued) and Timothy G. Richard, Fargo, ND, for defendants and appellees.

SANDSTROM, Justice.

[¶ 1] In 1999, an unmarried couple tried to rent from David and Mary Peterson. The Petersons refused because the unmarried couple were seeking to cohabit. The North Dakota Fair Housing Council ("Housing Council") and Robert and Patricia Kippen—the unmarried couple, who had since married—sued, claiming housing discrimination in violation of the North Dakota Human Rights Act. They appeal the summary judgment dismissing their claims. We affirm, concluding the Petersons lawfully refused to rent to the unmarried couple seeking to cohabit.

I

[¶ 2] On March 8, 1999, Robert Kippen and Patricia DePoe tried to rent a house or duplex from the Petersons. The Petersons refused because the couple was unmarried and seeking to unlawfully cohabit.

In April 1999, the couple married. On August 26, 1999, the North Dakota Fair Housing Council, a nonprofit corporation, and the Kippens sued the Petersons, alleging housing discrimination in violation of N.D.C.C. ch. 14–02.4, the North Dakota Human Rights Act.

[¶ 3] The Petersons moved to dismiss the Housing Council for lack of standing, arguing the Housing Council was not an "aggrieved person" entitled to relief under the housing statute. The district court granted the motion, holding the Housing Council lacked standing under the North Dakota Human Rights Act and holding it was not a real party in interest. The Housing Council appealed from the dismissal, arguing it is an aggrieved party and has standing to sue the Petersons.

[¶ 4] Subsequent to the dismissal of the Housing Council, the district court dismissed the Kippens' claim by summary judgment. The district court granted summary judgment in favor of the Petersons, concluding no genuine issue of material fact existed, North Dakota public policy disfavored cohabitation, and, based on the North Dakota Human Rights Act and North Dakota's cohabitation statute, the Petersons were entitled to deny the Kippens housing.[1] The Kippens appealed, arguing the district court misinterpreted North Dakota law.

[¶ 5] The Housing Council's and the Kippens' appeals were timely. The district court had jurisdiction under N.D.C.C. § 27–05–06. This Court has jurisdiction under N.D. Const. art. VI, § 6, and N.D.C.C. § 28–27–01.

## II

[¶ 6] We are asked to decide whether refusing to rent to an unmarried couple because they are seeking to cohabit violates the discriminatory housing practices provision of the North Dakota Human Rights Act, N.D.C.C. § 14–02.4–12. The question is one of statutory interpretation, a question of law, fully reviewable on appeal. *Gregory v. North Dakota Workers Comp. Bureau*, 1998 ND 94, ¶ 26, 578 N.W.2d 101.

[¶ 7] North Dakota Century Code § 12.1–20–10 provides:

> Unlawful cohabitation. A person is guilty of a class B misdemeanor if he or she lives openly and notoriously with a person of the opposite sex as a married couple without being married to the other person.

---

1. The dissent concludes the Petersons and the district court presumed the Kippens were cohabiting, because insufficient evidence existed to establish the Kippens' conduct amounted to cohabitation. Since the outset of this litigation, the Kippens have conceded they were cohabiting. In their complaint and in their first amended complaint, the Kippens alleged, "At all times relevant to this action, [the Kippens] were cohabitating [sic] as an unmarried couple." In their depositions, the Kippens acknowledged living together and having sex together at the time they sought housing from the Petersons. The dissent, at ¶ 57, says, "The record does not contain evidence sufficient to show the Kippens committed unlawful cohabitation." Contrary to the dissent's conclusion, the district court did not *presume* the Kippens cohabited, but rather accepted the pleadings, depositions, and record evidence as required by our rules and cases. *See* N.D.R.Civ.P. 56(c) (summary judgment may be rendered based on the pleadings, depositions, answers to interrogatories, or other record evidence). By suggesting the district court was presumptuous in accepting the Kippens' concession, the dissent has misconceived the facts and our clearly announced standard for summary judgment. *Id.; see also Swenson v. Raumin*, 1998 ND 150, ¶ 8, 583 N.W.2d 102 (summary judgment is proper "if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving factual disputes would not alter the results").

[¶ 8] The pertinent human rights statute in effect at the time of the alleged violation, North Dakota Century Code § 14–02.4–12 (1995),[2] provided:

Discriminatory housing practices by owner or agent. It is a discriminatory practice for an owner of rights to housing or real property or the owner's agent or a person acting under court order, deed or trust, or will to:

1. Refuse to transfer an interest in real property or housing accommodation to a person because of race, color, religion, sex, national origin, age, physical or mental disability, or status with respect to marriage or public assistance;

2. Discriminate against a person in the terms, conditions, or privileges of the transfer of an interest in real property or housing accommodation because of race, color, religion, sex, national origin, age, physical or mental disability, or status with respect to marriage or public assistance; or

3. Indicate or publicize that the transfer of an interest in real property or housing accommodation by persons is unwelcome, objectionable, not acceptable, or not solicited because of a particular race, color, religion, sex, national origin, age, physical or mental disability, or status with respect to marriage or public assistance.

A

[¶ 9] We have not previously addressed the relationship between N.D.C.C. §§ 12.1–20–10 and 14–02.4–12. The issue, however, has been addressed in a formal attorney general's opinion and in two federal district court opinions. We begin with a review of the history of the legislation.

1

[¶ 10] North Dakota has prohibited unlawful cohabitation since statehood.[3] 1890 N.D. Sess. Laws ch. 91, § 16. The provision, as codified in 1895, see N.D.R.C. ch. 28, § 7171 (1895), remained essentially unchanged until the 1970s:

Unlawful cohabitation—Punishment.— Every person who lives openly and notoriously and cohabits as husband or wife with a person of the opposite sex without being married to such person, is guilty of a misdemeanor and shall be punished by imprisonment in the county jail for not less than thirty days nor more than one year, or by a fine of not less than one hundred dollars nor more than five hundred dollars.

N.D.C.C. § 12–22–12 (1960).

2

[¶ 11] The 1971 legislative assembly provided for an interim committee to draft a new criminal code. 1971 N.D. Sess. Laws, H.C.R. 3050. The interim committee considered whether to recommend repeal of the prohibition on unlawful cohabitation. One member argued for keeping a prohibition to prevent fraud. See Minutes of Interim Comm. on Judiciary "B" 12 (July 20–21, 1972) (noting Rep. Hilleboe's belief the statute should be retained with emphasis on fraud). A proposed interim committee draft on unlawful cohabitation

---

2. The provisions are now found at N.D.C.C. §§ 14–02.5–02 and 14–02.5–07.

3. Cohabitation was also prohibited in Dakota Territory. According to the Laws of Dakota, 1862–63, Criminal Code, Ch. 10 § 4:

If any man and woman not being married to each other, shall lewdly and lasciviously cohabit and associate together, or if any man or woman, married or unmarried, shall be guilty of open and gross lewdness or lascivious behaviour, every such person shall be punished, by fine not exceeding three hundred dollars, or by imprisonment in a county jail not exceeding three months.

contained a prohibition if the conduct was "with intent to defraud another or others of money or property," but that language was omitted from the committee's recommendation. *See Minutes of Interim Comm. on Judiciary "B"* 8 (Aug. 24–25, 1972) (noting alternative fraud language).

[¶ 12] Because sexual offenses were a controversial portion of the proposed new criminal code, alternative provisions were submitted to the 1973 legislature in three separate bills. All three bills contain the same language on unlawful cohabitation with the exception that one alternative would have made the offense a Class A misdemeanor instead of a Class B misdemeanor. *See A Hornbook to the North Dakota Criminal Code,* 50 N.D. L.Rev. 639, 742 (1974) (identifying the alternative bills: S.B.2047, S.B.2048, and S.B.2049). Testifying before the 1973 legislature, Professor Thomas Lockney, who had been a member of the interim committee, said:

> All three alternatives continue to prohibit unlawful cohabitation. Under Alternative 1, the penalty is for a Class A misdemeanor; under 2 and 3 a Class B misdemeanor.

*Hearing on S.B.2047, S.B.2048, and S.B. 2049 Before the House Judiciary Comm.,* 43rd N.D. Legis. Sess. (Jan. 17, 1973) (testimony of Thomas M. Lockney, Attorney-at-Law). The new criminal code was approved by the 1973 legislature, with a delayed effective date of July 1, 1975. 1973 N.D. Sess. Laws chs. 116, 117; *see also A Hornbook to the North Dakota Criminal Code,* 50 N.D. L.Rev. 639 (1974).

3

[¶ 13] The 1983 legislature adopted the North Dakota Human Rights Act. 1983 N.D. Sess. Laws ch. 173. The legislative history reflects no discussion of the cohabitation statute.

4

[¶ 14] The issue of a claimed conflict between the cohabitation statute and the Human Rights Act was presented to the attorney general in 1990. In a formal opinion, the attorney general wrote:

> N.D.C.C. § 14–02.4–12 provides, in part:
>
> > 14–02.4–12. Discriminatory housing practices by owner or agent. It is discriminatory practice for an owner of rights to housing or real property or the owner's agent or a person acting under court order, deed or trust, or will to:
> >
> > > 1. Refuse to transfer an interest in real property or *housing accommodation* to a person because of race, color, religion, sex, national origin, age, physical or mental handicap, or *status with respect to marriage or public assistance;*
>
> (Emphasis supplied.)

However, N.D.C.C. § 12.1–20–10 prohibits unmarried persons of the opposite sex from openly living together as a married couple. The North Dakota Supreme Court has not ruled on the apparent conflict between N.D.C.C. §§ 14–02.4–12's protection of a person's right to housing notwithstanding the person's marital status, and N.D.C.C. § 12.1–20–10's prohibition against allowing unmarried couples to live as a married couple. However, there has been similar litigation in other states whose laws prohibit both cohabitation and discriminatory housing practices based on marital statutes. In *McFadden v. Elma Country Club,* 26 Wash.App. 146 [195], 613 P.2d 146 (1980), the court held that, notwithstanding a statute prohibiting discrimination based upon marital status, a country club could refuse to admit to membership an unmarried woman cohabiting with a man. *Id.* at 152. The court's

holding was based upon the fact the statute prohibiting cohabitation was not repealed when the discrimination statute was enacted. This fact the court said "would vitiate any argument that the legislature intended 'marital status' discrimination to include discrimination on the basis of a couple's unwed cohabitation." *Id.* at 150.

As in the *McFadden* case, N.D.C.C. § 12.1–20–10 was not repealed when N.D.C.C. § 14–02.4–12 was enacted. Thus, the continuing existence of the unlawful cohabitation statute after the enactment of N.D.C.C. § 14–02.4–12 vitiates "any argument that the legislature intended 'marital status' discrimination to include discrimination on the basis of a couple's unwed cohabitation." *McFadden* at 150.

Additionally, where there is a conflict between two statutes, the particular provision will control the general so that effect can be given to both statutes. N.D.C.C. § 1–02–07. In this conflict N.D.C.C. § 12.1–20–10 regulates one particular activity, unmarried cohabitation. N.D.C.C. § 14–2.4–12 on the other hand, regulates several bases for discrimination. Consequently, the conflict is resolved by applying the terms of N.D.C.C. § 12.1–20–10 to this situation.

Therefore, it is my opinion that it is not an unlawful discriminatory practice under N.D.C.C. § 14–02.4–12 to discriminate against two individuals who chose to cohabit together without being married.

Attorney General's Opinion 90–12 (1990).

5

[¶ 15] In 1991, House Bill 1403, a measure to repeal the cohabitation statute, was introduced, with the legislator who had requested the 1990 attorney general's opinion as the primary sponsor. She testi-fied, "As you will see, the Attorney General's Opinion of May 7, 1990 found that it was not an unlawful discriminatory practice under N.D.C.C. 14–02.4–12 to refuse to rent housing to unmarried persons of the opposite sex who desire to live together." *Hearing on H.B. 1403 Before the House Judiciary Comm.*, 52nd N.D. Legis. Sess. (Jan. 22, 1991) (testimony of Judy L. DeMers, District 17–18 House Representative). Also contained in the legislative history of House Bill 1403 are copies of Attorney General's Opinion 90–12 and copies of the relevant statutes. The House of Representatives defeated the bill by a vote of 27 yeas and 78 nayes.

6

[¶ 16] In 1999, the United States District Court for North Dakota decided a case involving the alleged conflict between the cohabitation statute and the Human Rights Act and concluded it was not unlawful to refuse to rent to an unmarried couple seeking to cohabit:

On May 7, 1990, the Office of the Attorney General for the State of North Dakota issued an opinion to State Representative Judy L. DeMers on the question of whether it is an unlawful discriminatory practice under N.D.Cent. Code § 14–02.4–12 to refuse to rent housing to unmarried persons of the opposite sex who desire to live together as a married couple in light of the prohibition against such cohabitation under N.D.Cent.Code § 12.1–20–10. *See* 1990 N.D. Op. Atty. Gen. 43. The Attorney General determined that such a refusal was not an unlawful discriminatory practice. *Id.*

"The Supreme Court of North Dakota has held that an Attorney General's opinion has the force and effect of law until a contrary ruling by a court. That court has further held that opinions of an Attorney General are 'entitled to re-

spect,' and a court should follow them if 'they are persuasive.' " *Fargo Women's Health Organization, et al. v. Schafer, et al.*, 18 F.3d 526, 530 (8th Cir.1994) (citations omitted). In this case, the opinion is highly persuasive, and is consistent with an independent analysis of the question presented. Foremost for consideration is the fact that N.D.Cent. Code § 12.1–20–10 was not repealed when N.D.Cent.Code § 14–02.4–12 was enacted in 1983; nor was it repealed in 1995 when the discriminatory housing practices statute was last amended and reenacted, despite the issuance of the Attorney General's opinion in 1990. Additionally, when recently presented with the opportunity to speak to the "public policy/morality issue" of N.D.Cent.Code § 12.1–20–10, the North Dakota Supreme Court declined to address it. *See Cermak v. Cermak*, 569 N.W.2d 280, 285–86 (N.D.1997).

These statutes can be construed "... so that effect may be given to both provisions...." *See* N.D.Cent.Code § 1–02–07. The conflict between the two provisions is not irreconcilable because the statutes can be harmonized to provide an interpretation that gives effect to both provisions. The phrase "status with respect to marriage" contained within N.D.Cent.Code § 14–02.4–12 is not rendered meaningless by application of the language of the unlawful cohabitation statute to exclude unmarried, opposite sex cohabitators [sic]. The statute will still regulate against several discriminatory housing practices based on status with respect to marriage.

Accordingly, the court must find that the allegations of the plaintiffs in paragraphs 18 through 21 and 27 through 30 have failed to state a claim upon which relief can be granted with regard to plaintiffs' claims of discrimination based on status with respect to marriage con-

tained in paragraphs 91(A), (B) & (C) of their complaint and said claims shall be dismissed to the extent they allege such discrimination.

*North Dakota Fair Housing Council, Inc. v. Haider*, No. A1–98–077 (D.N.D.1999).

### 7

[¶ 17] In 2000, the United States District Court for North Dakota decided a suit similar to this one brought by the Housing Council. *North Dakota Fair Housing Council v. Woeste*, No. A1–99–116 (D.N.D.2000). The federal court, analyzing North Dakota law and distinguishing federal cases relied on by the Housing Council, concluded the Housing Council lacked standing to sue under the North Dakota Human Rights Act.

### 8

[¶ 18] The District Court in this case considered the foregoing history and the plain wording of the statutes in deciding to dismiss the claims of the Housing Council and the Kippens.

### B

▮▮▮ [¶ 19] With this historical background, we turn to the framework for analyzing statutes and claimed conflicts between statutes. Statutes are to be construed liberally to effectuate their purpose. N.D.C.C. § 1–02–01. When the words of a statute are clear, they cannot be ignored under the pretext of pursuing their spirit. N.D.C.C. § 1–02–05. The specific prevails over the general. N.D.C.C. § 1–02–07. Statutes are construed to give effect to each provision. N.D.C.C. § 1–02–07. Repeal by implication is not favored. *Tharaldson v. Unsatisfied Judgment Fund*, 225 N.W.2d 39, 45 (N.D.1974) (citing Sands' Sutherland Statutory Construction, Vol. 1A, § 22.13, at 139 and 149 (4th ed. 1972)). Long-

standing administrative interpretations are given deference. *Delorme v. North Dakota Dep't of Human Services,* 492 N.W.2d 585, 587 (N.D.1992). Attorney general's opinions and federal court decisions are given deference if they are persuasive. *Werlinger v. Champion Healthcare Corp.,* 1999 ND 173, ¶ 47, 598 N.W.2d 820.

C

[¶ 20]   We now consider the meaning of the cohabitation statute and the meaning of the Human Rights Act discriminatory housing practices provision.

1

[¶ 21]   The cohabitation statute was amended to its present form in 1973, effective in 1975.   North Dakota's cohabitation statute, N.D.C.C. § 12.1–20–10, states:

A person is guilty of a class B misdemeanor if he or she lives openly and notoriously with a person of the opposite sex as a married couple without being married to the other person.

The 1973 amendment of the statute removed the language "cohabits as husband or wife" and added "lives openly and notoriously with a person of the opposite sex as a married couple." *See State v. Hoffman,* 68 N.D. 610, 282 N.W. 407 (1938) (detailing the pre–1973 statute).

[¶ 22]   Varying definitions of cohabitation exist.   The 1996 edition of Merriam-Webster's Dictionary of Law defines cohabit as "to live together as a married couple or in the manner of a married couple."   The 1999 edition of Black's Law Dictionary, at page 254, defines cohabitation as "[t]he fact or state of living together, esp. as partners in life, usu. with the

suggestion of sexual relations."   Notorious cohabitation is the "act of a man and a woman openly living together under circumstances that make the arrangement illegal under statutes that are now rarely enforced." [4]   *Id.*   The Minnesota Supreme Court has defined "cohabit" as living "together in a sexual relationship when not legally married."   *State by Cooper v. French,* 460 N.W.2d 2, 4 n. 1 (Minn.1990) (citing The American Heritage Dictionary of the English Language 259 (1980) (New College Dictionary)).

■   [¶ 23]   "In ascertaining legislative intent, we look first to the words used in the statute, giving them their plain, ordinary, and commonly understood meaning." *Douville v. Pembina County Water Resource District,* 2000 ND 124, ¶ 9, 612 N.W.2d 270 (citations omitted).   "When a statute is clear and unambiguous on its face, we will not disregard the letter of the statute under the pretext of pursuing its spirit, because the legislative intent is presumed clear from the face of the statute." *Id.* (citing N.D.C.C. § 1–02–05; *Lawrence v. North Dakota Workers Comp. Bureau,* 2000 ND 60, ¶ 19, 608 N.W.2d 254).

■   [¶ 24]   In codification or recodification, the presumption is that no change in the law was intended, absent a clear legislative intent to the contrary.   *See Evanson v. Wigen,* 221 N.W.2d 648, 654 (N.D.1974) (a simple change in diction or phraseology—absent a clear legislative intent to the contrary—is presumed to be a change "for purpose of clarity rather than for a change in meaning") (quoting 50 Am. Jur. *Statutes* § 445).   This Court has stated:

---

4.   Although it is argued cohabitation statutes are rarely enforced, this Court has held the lack of enforcement to be of no significance. *See State v. Gamble Skogmo, Inc.,* 144 N.W.2d 749, 765 (N.D.1966) (laxity in enforcement does not result in a denial of equal protection of the laws) (citations omitted).

Usually a revision of statutes* simply iterates the former declaration of legislative will. No presumption arises from changes of this character that the revisers or the legislature in adopting the revision intended to change the existing law; but the presumption is to the contrary, unless an intent to change it clearly appears.

The general presumption obtains that the codifiers did not intend to change the law as it formerly existed. Changes made in the revision of statutes by alteration of the phraseology will not be regarded as altering the law unless there is a clear intent so to do.

*State ex rel. Johnson v. Broderick*, 75 N.D. 340, 27 N.W.2d 849, 864 (1947) (internal citations and quotations omitted). Therefore, we presume the legislature did not intend a change to the cohabitation law.

### a

[¶ 25] The Housing Council asserts that North Dakota has decriminalized all sexual relations among consenting adults. The assertion is contradicted by the cohabitation statute as well as the criminal penalties for adultery, bigamy, prostitution, or incest, notwithstanding the consent of the parties. N.D.C.C. §§ 12.1–20–09, 12.1–20–13, 12.1–29–03, 12.1–20–11.

### b

[¶ 26] The Housing Council and the Kippens argue the 1973 recodification of the cohabitation statute was intended to retain the statute only as an antifraud provision. Although the minutes of the interim committee clearly reflect that one member of the committee would have preferred to retain only an antifraud prohibition, the entire legislative history shows the interim committee deleted the antifraud language from the section, and the 1973 Senate Judiciary Committee was told the statute would "continue to prohibit unlawful cohabitation." *Hearing on S.B. 2047, S.B.2048, and S.B.2049 Before the House Judiciary Comm.*, 43rd N.D. Legis. Sess. (Jan. 17, 1973) (testimony of Thomas M. Lockney, Attorney–at–Law).

### 2

[¶ 27] At issue is the term "status with respect to marriage," which is undefined under the Human Rights Act. Analyzing other definitions under North Dakota law, the district court concluded the "Legislature intended the phrase to mean being married, single, separated or divorced."

[¶ 28] The Housing Council and the Kippens argue "status with respect to marriage" is simple: a person is either married or not married. Although it is unlawful to deny housing based solely on whether a person is or is not married, the relevant inquiry is whether a person is divorced, widowed, or separated, rather than simply married or unmarried.

[¶ 29] The Petersons argue that although it is true that under the discriminatory housing provision a person cannot be discriminated against because of marital status, the Kippens were denied housing not because they were single, but because they were unmarried and were seeking to live together as if they were married. A review of the cohabitation statute evidences this point.

[¶ 30] Numerous courts have addressed language similar to "status with respect to marriage," the language at issue here. Those courts disagree regarding the appropriate weight to give to words with an import similar to "status with respect to marriage." In *McCready v. Hoffius*, 222 Mich.App. 210, 564 N.W.2d 493, 495–96 (1997), the court differentiated martial status from conduct by concluding the term "marital status" was legislatively intended

to prohibit discrimination "based on *whether* a person is married" (quoting *Miller v. C.A. Muer Corp.*, 420 Mich. 355, 362 N.W.2d 650 (1984)).

[¶ 31] The Wisconsin Supreme Court has also concluded refusal to rent to unmarried tenants who choose to live together is based on conduct rather than status. *See County of Dane v. Norman*, 174 Wis.2d 683, 497 N.W.2d 714 (1993). On the other´ hand, Alaska, Massachusetts, and California have concluded refusal to rent to unmarried cohabitants is based upon status rather than conduct. *See Smith v. Fair Employment & Housing Comm'n*, 12 Cal.4th 1143, 51 Cal.Rptr.2d 700, 913 P.2d 909 (1996), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2531, 138 L.Ed.2d 1031 (1997); *Swanner v. Anchorage Equal Rights Comm'n* 874 P.2d 274 (Alaska 1994), *cert. denied*, 513 U.S. 979, 115 S.Ct. 460, 130 L.Ed.2d 368 (1994); *Attorney General v. Desilets*, 418 Mass. 316, 636 N.E.2d 233 (1994).

3

[¶ 32] We seek to interpret our statutes with a goal of giving effect to each. N.D.C.C. § 1–02–07. Implied repeal is not favored. *Tharaldson v. Unsatisfied Judgment Fund*, 225 N.W.2d 39, 45 (N.D.1974).

[¶ 33] Statutes are to be liberally construed "with a view to effecting its objects and to promoting justice." N.D.C.C. § 1–02–01. The purpose of the North Dakota Human Rights Act is "to prohibit discrimination ... and to deter those who aid, abet, or induce discrimination or coerce others to discriminate." N.D.C.C. § 14–02.4–01. Criminal statutes are intended to vindicate public norms, to give fair warning of prohibited conduct, to prescribe penalties commensurate with the seriousness of the offense, and to effectuate other defined purposes. N.D.C.C. § 12.1–01–02.

[¶ 34] When the legislature enacted the Human Rights Act, it is presumed to have known of the existing criminal cohabitation statute. We have said, "The legislature will not be held to have changed a law it did not have under consideration while enacting a later law, unless the terms of the subsequent act are so inconsistent with the provisions of the prior law that they cannot stand together." *Birst v. Sanstead*, 493 N.W.2d 690, 694 (N.D.1992) (citing *Tharaldson v. Unsatisfied Judgment Fund*, 225 N.W.2d 39, 45 (N.D.1974)).

[¶ 35] In essence, by suggesting the Human Rights Act requires that housing be provided regardless of compliance with the criminal code, the Housing Council and the Kippens are asking us to repeal or to give new meaning to the cohabitation statute. We are then confronted with the well-established rule precluding amendment or repeal of legislation by implication. *Id.*

> An implied amendment is an act which purports to be independent of, but which in substance alters, modifies, or adds to a prior act. To be effective, an amendment of a prior act ordinarily must be expressed. Amendments by implication, like repeals by implication, are not favored and will not be upheld in doubtful cases.

*Id.* at 694–95 (citations omitted). In North Dakota, there is "an established presumption" against amending or repealing a piece of legislation by implication. *Id.* at 695 (citation omitted).

[¶ 36] Coupled with the "presumption against repealing or amending legislation, we are ... to harmonize different statutes passed by the legislature and give them full effect." *Id.* (citing N.D.C.C. § 1–02–07). "Statutes relating to the same subject matter shall be construed together and should be harmonized, if possible, to give meaningful effect to each, without rendering one or the other use-

less." *Id.* (quoting *Westman v. North Dakota Workers Comp. Bureau,* 459 N.W.2d 540, 541 (N.D.1990)).

[¶ 37] The cohabitation statute and the discriminatory housing provision are harmonized by recognizing that the cohabitation statute regulates conduct, not status. The opposite interpretation would render the prohibition against cohabitation meaningless.

[¶ 38] Like Michigan, Wisconsin, and Minnesota, we conclude these two provisions may be harmonized while still giving each of them full effect. N.D.C.C. § 1–02–07. It is unlawful to openly and notoriously live together as husband and wife without being married. It is unlawful to deny housing based on a person's status with respect to marriage (i.e., married, single, divorced, widowed, or separated). It is not unlawful to deny housing to an unmarried couple seeking to openly and notoriously live together as husband and wife.

[¶ 39] In addition, where there is a conflict between two statutes, the particular provision will control the general so that effect can be given to both statutes. N.D.C.C. § 1–02–07. In this claimed conflict, N.D.C.C. § 12.1–20–10 regulates one particular activity, unmarried cohabitation. N.D.C.C. § 14–02.4–12, on the other hand, regulates several bases for discrimination. The terms of the more specific statute, N.D.C.C. § 12.1–20–10, prevail.

D

[¶ 40] Although we are not bound by attorney general's opinions interpreting statutes, we will follow them if they are persuasive. *Werlinger v. Champion Healthcare Corp.,* 1999 ND 173, ¶ 47, 598 N.W.2d 820 (citing *United Hospital v. D'Annunzio,* 514 N.W.2d 681, 685 (N.D. 1994); *State v. Beilke,* 489 N.W.2d 589, 593

(N.D.1992)). We give "respectful attention to the attorney general's opinions and follow them when we find them persuasive." *Holmgren v. North Dakota Workers Comp. Bureau,* 455 N.W.2d 200, 204 (N.D. 1990). Attorney general's opinions guide state officers until superseded by judicial opinions. *Werlinger,* 1999 ND 173, ¶ 47, 598 N.W.2d 820 (citing *State ex rel. Johnson v. Baker,* 74 N.D. 244, 259, 21 N.W.2d 355, 364 (1945)).

[¶ 41] The attorney general's opinion is supported by the legislative history of the two statutes and specifically addresses the conflict between them. Attorney General's Opinion 90–12 concluded:

N.D.C.C. § 12.1–20–10 was not repealed when N.D.C.C. § 14–02.4–12 was enacted. Thus, the continuing existence of the unlawful cohabitation statute after the enactment of N.D.C.C. § 14–02.4–12 vitiates "any argument that the legislature intended 'marital status' discrimination to include discrimination on the basis of a couple's unwed cohabitation."

(Citation omitted).

[¶ 42] Although not binding upon the courts, "an Attorney General's official opinion nonetheless has important bearing on the construction and interpretation of a statute." *Hughes v. State Farm Mut. Auto. Ins. Co.,* 236 N.W.2d 870, 876 (N.D.1975) (citing 2A Sutherland Statutory Construction § 49.05, p. 240; *Walker v. Weilenman,* 143 N.W.2d 689, 691 (N.D.1966)). "Such official opinion of the Attorney General is especially persuasive when subsequent legislative action appears to confirm the opinion." *Id.*

[¶ 43] Since the attorney general's opinion was published in 1990, the legislature completed five biennial sessions and at least once considered repealing the cohabitation statute. In 1991, a measure to repeal the cohabitation statute, House Bill 1403, was introduced, presented with the

Attorney General's opinion, and defeated. It is clear the legislature was aware of the alleged statutory conflict.

[¶ 44] In light of the five completed biennial legislative sessions and the defeat of the measure to repeal the cohabitation statute, the legislature has impliedly approved the attorney general's opinion. The implied approval gives even greater weight to the construction of the cohabitation statute and the attorney general's opinion. *See Horst v. Guy,* 219 N.W.2d 153, 159–60 (N.D.1974); *Walker v. Weilenman,* 143 N.W.2d 689, 694 (N.D.1966); *State v. Equitable Life Assurance Soc'y,* 68 N.D. 641, 282 N.W. 411, 415–16 (1938).

### E

[¶ 45] A federal district court decision interpreting North Dakota law is not binding upon North Dakota courts. We will, however, respect a federal district court opinion if it is persuasive and based upon sound reasoning.

[¶ 46] Citing a 1990 North Dakota Attorney General's opinion and a federal court decision interpreting this issue, the district court concluded that refusing to rent to a couple seeking to cohabit is not a discriminatory practice. *See* Attorney General's Opinion 90–12 (1990); *North Dakota Fair Housing Council, Inc. v. Haider,* No. A1–98–077 (D.N.D.1999).

[¶ 47] The *Haider* court cited Attorney General Opinion 90–12 as "highly persuasive" and entitled to respect. Further, the court stated:

Foremost for consideration is the fact that N.D. Cent.Code § 12.1–20–10 was not repealed when N.D. Cent.Code § 14–02.4–12 was enacted in 1983; nor was it repealed in 1995 when the dis-

criminatory housing practices statute was last amended and reenacted, despite the issuance of the Attorney General's opinion in 1990. Additionally, when recently presented with the opportunity to speak to the "public policy/morality issue" of N.D. Cent.Code § 12.1–20–10, the North Dakota Supreme Court declined to address it. *See Cermak v. Cermak,* 569 N.W.2d 280, 285–86 (N.D. 1997).

These statutes can be construed "... so that effect may be given to both provisions...." *See* N.D. Cent.Code § 1–02–07. The conflict between the two provisions is not irreconcilable because the statutes can be harmonized to provide an interpretation that gives effect to both provisions. The phrase "status with respect to marriage" contained within N.D. Cent.Code § 14–02.4–12 is not rendered meaningless by application of the language of the unlawful cohabitation statute to exclude unmarried, opposite sex cohabitators [sic]. The statute will still regulate against several discriminatory housing practices based on status with respect to marriage.

*North Dakota Fair Housing Council, Inc. v. Haider,* No. A1–98–077, 7–8 (D.N.D. 1999).

[¶ 48] The federal court decision is entitled to respect.

### III

[¶ 49] Under the words of the statute, the rules of statutory construction, and the legislative, administrative, and judicial history, we conclude it is not an unlawful discriminatory practice under N.D.C.C. § 14–02.4–12 to refuse to rent to unmarried persons seeking to cohabit. Summary judgment was therefore appropriate.[5]

---

5. The dissent is based on the flawed premise that the Petersons would have had to prove

the Kippens guilty of unlawful cohabitation. The Kippens did not raise the argument and

[¶ 50] If we were to assume the Housing Council would have standing to contest the Petersons' actions, summary judgment would equally apply to dispose of the Housing Council's alleged claim. Because, as a matter of law, there is no issue of material fact in this case, we need not address the argument that the Housing Council would have standing. *See State v. Evans*, 1999 ND 70, ¶ 17, 593 N.W.2d 336 ("we need not consider questions, the answers to which are not necessary to the determination of an appeal").

## IV

[¶ 51] The judgments of the district court are affirmed.

[¶ 52] VANDE WALLE, C.J., NEUMANN and MARING, JJ., concur.

KAPSNER, Justice, dissenting.

[¶ 53] Because the district court's award of summary judgment against the Kippens presumes, without adequate evidence, their conduct violated N.D.C.C. § 12.1–20–10, on the basis of their admission of intent to live together while unmarried, and because the district court erred under N.D.R.Civ.P. 12 and 17 in dismissing the Housing Council for lack of standing and as not a real party in interest, I respectfully dissent.

## I

[¶ 54] The legislative history clearly evinces an intent that N.D.C.C. § 12.1–20–10, prohibiting unlawful cohabitation, should not be repealed, notwithstanding its potential conflict with the former North Dakota Human Rights Act ("NDHRA"), N.D.C.C. § 14–02.4–12, which prohibited

housing discrimination on the basis of "status with respect to marriage." Since the statutes coexisted, they must be harmonized, if possible. *Birst v. Sanstead*, 493 N.W.2d 690, 695 (N.D.1992). The majority says the statutes are harmonized by recognizing that the cohabitation statute regulates conduct, not status. If that is so, then granting summary judgment under the record developed in this case is improper because there is insufficient evidence of conduct for which the Kippens could be prosecuted under § 12.1–20–10. The district court awarded summary judgment in favor of the Petersons despite the existence of a genuine issue of material fact that Kippens' conduct violated § 12.1–20–10. The Petersons presumed the Kippens were unlawfully cohabiting based on their marital status, and by granting summary judgment, the district court asks us to make the same presumption that the Kippens' conduct violated the cohabitation statute based only on their admission of intent to live together while unmarried.

## A

[¶ 55] Summary judgment is appropriate for resolving a controversy without a trial only if the evidence shows there is no genuine issue as to any material fact, or the inferences to be drawn from undisputed material facts, and if the evidence shows a party is entitled to judgment as a matter of law. *Mandan Educ. Ass'n v. Mandan Pub. Sch. Dist. No. 1*, 2000 ND 92, ¶ 6, 610 N.W.2d 64; *see also* N.D.R.Civ.P. 56(c). The evidence presented must be viewed in the light most favorable to the party opposing the motion, who must be given the benefit of all favorable

---

did not dispute the fact. The issue before us is not whether the Kippens could have been successfully prosecuted for the crime of unlawful cohabitation, but whether the legislature intended to prohibit landlords from refusing to rent to unmarried couples seeking to cohabit.

inferences which reasonably can be drawn from the evidence. *Mandan*, at ¶ 6.

[¶ 56]   In reviewing summary judgment decisions, we have emphasized that neither we nor the trial court are allowed to weigh evidence, determine credibility, or attempt to discern the truth of the matter. *Opp v. Source One Mgmt., Inc.*, 1999 ND 52, ¶ 16, 591 N.W.2d 101. Rather, the question for the court is whether a fact finder could return a verdict for the party bringing the motion on the evidence presented. *Wishnatsky v. Huey*, 1998 ND App 8, ¶ 5, 584 N.W.2d 859 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The mere existence of a scintilla of evidence in support of a party's position will be insufficient; there must be evidence on which the fact finder could reasonably find for the party. *Id.* Therefore, when determining if a genuine factual issue as to the alleged unlawful activity exists, the trial judge must bear in mind the actual quantum and quality of proof necessary to support liability. *Smith v. Land O'Lakes, Inc.*, 1998 ND 219, ¶ 12, 587 N.W.2d 173. Unless the evidence presented is of sufficient caliber or quantity to allow a rational finder of fact to find proof of the unlawful activity by the requisite burden of proof, there is no genuine issue of material fact regarding the illegal conduct. *Id.* (citing *Liberty Lobby*, at 254, 106 S.Ct. 2505).

[¶ 57]   The record does not contain evidence sufficient to show the Kippens committed unlawful cohabitation. Therefore, the mere existence of the cohabitation statute is an insufficient basis for awarding summary judgment on the asserted grounds that the refusal to rent was not discrimination.

B

[¶ 58]   Based on the legislative history, chronicled by the majority, I do not dispute the district court's conclusion that cohabitation is conduct rather than status. However, I take issue with the fact that both the Petersons and the district court have presumed Kippens' unlawful conduct based only on their unmarried status. According to the Kippens' Separate Statement of Material Facts not in Genuine Dispute, which the District Court also found to be undisputed, the Kippens were living together and were not married at the time Robert Kippen called the Petersons to inquire about renting housing. When receiving calls inquiring about rental property, Mary Peterson had the regular practice of asking who would be occupying the property and of informing callers the Petersons would not rent to an unmarried cohabiting couple because of the North Dakota cohabitation law. When Robert Kippen spoke to Mary Peterson, he said he was interested in the rental property and he and his fiancee would be living there. Robert Kippen made no representation they were married. In reply, Mary Peterson told Robert Kippen that the Petersons would not be able to rent to him because he was cohabiting with his fiancee. Thus, from the mere fact that Robert Kippen admitted his intent to occupy an apartment with his fiancee, Mary Peterson concluded the Kippens intended to unlawfully cohabit, but there is insufficient evidence to conclude the Kippens could be prosecuted for unlawfully cohabiting.

[¶ 59]   Under N.D.C.C. § 12.1–20–10, unlawful cohabitation is defined as "liv[ing] openly and notoriously with a person of the opposite sex as a married couple without being married to the other person." Mary Peterson had no evidence the Kippens would be living together "openly and notoriously," which this Court has defined to mean undisguised, unconcealed, and generally known or as a matter of common knowledge in the community. *See State v.*

*Hoffman,* 68 N.D. 610, 612, 282 N.W. 407, 409 (1938). Neither did Mary Peterson have proof that the Kippens would be living "as a married couple," which is a requirement of violating § 12.1–20–10. Rather, Mary Peterson presumed the Kippens' conduct was unlawful simply on the basis of their "status with respect to marriage." *See* N.D.C.C. § 14–02.4–12 (1995). Therefore, the district court erroneously granted summary judgment because there is a genuine issue as to material facts establishing that the Kippens actually were or would be unlawfully cohabiting. *See* N.D.R.Civ.P. 56(c) (rendering summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law").

[¶ 60] Although the plaintiffs' complaint stated, "At all times relevant to this action, [the Kippens] were cohabitating [sic] as an unmarried couple," nevertheless, there was still an issue in dispute whether they would be openly and notoriously living as a married couple, as proscribed under the unlawful cohabitation statute. As the majority concedes, "Varying definitions of cohabitation exist." The Petersons cannot presume the Kippens were planning to violate the unlawful cohabitation statute without evidence they were planning to "live[ ] openly and notoriously with a person of the opposite sex as a married couple without being married to the other person." *See* N.D.C.C. § 12.1–20.10. Mary Peterson had no evidence the Kippens would be violating the statute, but rather she presumed the Kippens' unlawful conduct simply from their unmarried status, and such presumption is discrimination based on "status with respect to marriage" within the meaning of former N.D.C.C. § 14–02.4–12.

[¶ 61] In awarding summary judgment against the Kippens, the district court discussed our definition of cohabitation in *Baker v. Baker,* 1997 ND 135, ¶ 13, 566 N.W.2d 806. In *Baker,* we stated cohabitation includes, "The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations." *Id.* On the basis of this definition, the plain language of N.D.C.C. § 12.1–20–10 prohibiting cohabitation, and the fact that Robert Kippen stated to Mary Peterson he would be living with his fiancee, the district court stated, "[I]t is clear that [the Kippens] would be in violation of N.D.C.C. § 12.1–20–10." The court further stated, "The Petersons refused to rent to [the Kippens] not because of their marital status but rather because [the Kippens] were planning on living together in violation of North Dakota law." However, Robert Kippens had not plainly admitted to Mary Peterson that he planned to violate all the elements of the cohabitation statute. *See In re Estate of Stanton,* 472 N.W.2d 741, 746 (N.D.1991) (stating summary judgment is only proper when a party fails to raise even a reasonable inference of the existence of an element essential to the party's claim and on which that party will bear the burden of proof at trial); *see also* N.D.C.C. § 12.1–20–10 (criminalizing openly and notoriously living with a person of the opposite sex as a married couple without being married to the other person).

[¶ 62] The district court's award of summary judgment is premature, as there was no evidence that the Kippens would be "living as a married couple," i.e., that they would be mutually assuming marital rights, duties and obligations usually manifested by married people, including but not necessarily dependent on sexual relations. *See Baker,* 1997 ND 135, ¶ 13, 566 N.W.2d 806. The standards for granting a sum-

mary judgment do not permit the trial court to conclude the Petersons were making a decision based on conduct violating N.D.C.C. § 12.1–20–10. Therefore, I would reverse the summary judgment.

## II

[¶ 63] The district court granted Petersons' motion to dismiss the Housing Council, under Rules 12 and 17, N.D.R.Civ.P., on the grounds that the Housing Council lacked standing to sue, under the former N.D.C.C. § 14–02.4–12, and is not a real party in interest. After a discussion of legislative history, the district court found the legislative intent "ambiguous and ambivalent" regarding whether the Housing Council is a person aggrieved by a discriminatory housing practice. Guided by our opinion in *Shark v. U.S. West Communications, Inc.*, 545 N.W.2d 194 (N.D.1996), the district court opined that "standing is dependent upon a truly independent claim," but the Housing Council's "entire claim . . . is dependent upon alleged violations of [the Kippens'] rights." The district court found the Kippens are the real parties in interest, the Housing Council's claims of personal loss are actually derivative of Kippens' claims, and the Council's injuries based on its role of citizens' watchdog group are "entirely voluntarily assumed." The district court concluded the Housing Council "failed to establish that it has a real interest in the litigation that is not dependent upon the claims of injury by third persons" and thus has no personal right or interest violated and, under these circumstances, lacks standing to pursue a claim in their own name. However, the district court erred in dismissing the Housing Council under Rules 12 and 17, N.D.R.Civ.P., as the Housing Council alleged independent and legally cognizable injuries sufficient to withstand a motion to dismiss on the pleadings. The district court's reliance on *Shark* does not support

the court's analysis underpinning its dismissal of the Housing Council.

## A

[¶ 64] Pursuant to N.D.R.Civ.P. 12, the Petersons filed a motion with the district court for an order dismissing with prejudice the Housing Council and its cause of action "on the basis that [the Housing Council] does not have standing to maintain this action under [the former] N.D.C.C. § 14.02.4–19. . . ." The former § 14.02.4–19 specified who may bring a civil action to enforce the former NDHRA: "Any person claiming to be aggrieved by a discriminatory practice in violation of this chapter with regard to housing or public accommodations or services may bring an action in the district court. . . ." The former NDHRA defined "person" as follows: "'Person' means an individual, partnership, association, corporation. . . ." N.D.C.C. § 14–02.4–02(11). The district court found that the Housing Council is "a non-profit corporation"; thus, the Housing Council is a person within the meaning of § 14–02.4–02(11). The Housing Council alleged in its first amended complaint that the Petersons' alleged discriminatory housing practices caused the Council to suffer injuries in the form of economic losses in staff pay for investigations and in the inability to undertake other efforts to end unlawful housing practices. The Council also alleged injury to its ability to carry out its purpose and to serve the public in its effort to eliminate housing discrimination, resolve fair housing disputes, find and make available decent rental housing for persons regardless of status with respect to marriage, and assure rights to the important social, professional, business, economic, and political benefits of associations that arise from living in a community where persons reside regardless of marital status.

[¶ 65] Our seminal case on standing is *State v. Carpenter*, 301 N.W.2d 106, 107 (N.D.1980), in which a two-pronged test was established to determine whether a litigant has alleged such a personal stake in the outcome of the controversy as to justify the exercise of the court's remedial powers to decide the merits of the dispute.[6] First, the litigant must have suffered some threatened or actual injury resulting from the putatively illegal action. *Id.* (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). Second, the asserted harm must not be a generalized grievance shared by all or a large class of citizens, that is, the litigant generally must assert his or her own legal rights and interests and cannot rest a claim to relief on the legal rights and interests of third parties. *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Litigants may assert only their own constitutional rights, unless they can present weighty countervailing policies. *Hovet v. Hebron Pub. Sch. Dist.*, 419 N.W.2d 189, 193 (N.D.1988).

[¶ 66] Previously, we have concluded a utility company had no standing to advance tribal sovereign rights of self-government for alleged unlawful interference with the tribe's interests. *In re Application of Otter Tail Power Co.*, 451 N.W.2d 95, 97 (N.D.1990); *see also Swanson v. N.D. Workers Comp. Bureau*, 553 N.W.2d 209, 212 (N.D.1996) (determining a claimant lacked standing to challenge the Bureau's alleged lack of a statutorily required peer review system for determining reasonableness of fees and payment denials for unjustified treatments, because under the statute only doctors or health care providers could appeal adverse Bureau decisions regarding fee reasonableness and payment denials); *State v. Tibor*, 373 N.W.2d 877, 880–81 (N.D.1985) (concluding a criminal defendant had no standing to raise a vagueness challenge to a criminal statute, because he did not demonstrate the statute was vague as applied to his own conduct). *But see State v. Hagerty*, 1998 ND 122, ¶ 10, 580 N.W.2d 139 (stating a counterclaim defendant had standing to challenge the authority of special assistant attorneys general, who were retained by the Attorney General and State entities under contingent fee agreements, to prosecute litigation against the counterclaim defendant).

[¶ 67] Our standing test in the administrative context differs from the standing test set out in *Carpenter*, 301 N.W.2d at 107, but sheds light on the meaning of "aggrieved." Our administrative standing inquiry was developed in the case of *In re Application of Bank of Rhame*, 231 N.W.2d 801, 806–08 (N.D.1975), because standing is necessary for judicial review through appeal of an administrative order. Faced with an issue of who was a proper party to seek review on appeal of an administrative decision, we expressly noted, "We should not and do not place a narrow or limited construction upon the appropriate statutory provisions governing who may be a party for purposes of appeal or

---

**6.** *Compare Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (establishing the "irreducible constitutional minimum of standing" contains three elements: (1) the plaintiff must have suffered an injury in fact, an invasion of a legally protected interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury must be causally connected to the complained-of conduct, that is, the injury must be fairly traceable to the challenged action of the defendant and not the result of an independent action of some third party who is not before the court; and (3) it must be likely, rather than merely speculative, that the injury will be redressed by a favorable decision).

review. The law on standing developed by earlier case law which was narrow and limited has been severely criticized...." *Id.* at 806. We explained that former N.D.C.C. § 28–32–14 provided, "[A]ny party before an administrative agency who is aggrieved by the decision" may request a rehearing, and we defined "party aggrieved" as "one whose right has been directly and injuriously affected by action of court." *Rhame,* at 807–08. We specifically stated: "Any doubt on the question of standing involving a decision by an administrative body should be resolved in favor of permitting the exercise of the right of appeal by any person aggrieved in fact." *Id.* at 808. Based on this expansive view of the standing doctrine, we enunciated our three-part standing test for administrative appeals: "[A]ny person who is directly interested in the proceedings before an administrative agency[,] who may be factually aggrieved by the decision of the agency, and who participates in the proceeding before such agency, is a 'party' to any proceedings for the purposes of taking an appeal from the d[e]cision." *Id.*

[¶ 68] Under this three-part analysis, we have denied standing when litigants were not aggrieved in fact. *Shark v. U.S. West Communications, Inc.,* 545 N.W.2d 194, 200 (N.D.1996). Shark appealed an administrative approval of the sale and transfer of telephone exchanges by U.S. West to cooperative and independent telephone companies. *Id.* at 195. We denied standing to Shark because he was not factually aggrieved, since he was a customer of a telephone exchange which was not being transferred and did "not demonstrate how he will suffer economic injury or physical interference with his telephone service from this sale and transfer" of telephone exchanges of which he was not a customer. *Id.* at 195, 199–200. We reasoned, "The generalized interest [Shark] describes is shared with every other telephone customer anywhere, and any potential effect on him is so remote and speculative that there is no reasonable basis for judicial review of his claims." *Id.* at 200. Thus, we found Shark had not shown the personal stake required for the adversarial position necessary for an actual case or controversy, as he made no plausible argument how he will either gain or lose anything from the transfer of telephone exchanges that do not furnish his telephone service. *Id.; see also Vickery v. N.D. Workers Comp. Bureau,* 545 N.W.2d 781, 783–85 (N.D.1996) (denying standing to a claimant who alleged the potential of injury rather than injury in fact, as remote possibilities and speculation of harm were insufficient to establish that he was factually aggrieved, and a nominal, formal, or technical interest in the action will not suffice).

[¶ 69] Conversely, we have concluded parties did have standing to appeal administrative decisions upon proof they hurdled the three-part test and were factually aggrieved. *In re Juran & Moody, Inc.,* 2000 ND 136, ¶ 21, 613 N.W.2d 503; *see also Trinity Med. Ctr. v. N.D. Bd. of Nursing,* 399 N.W.2d 835, 836–38 (N.D.1987) (allowing nursing school operators to challenge the constitutionality of a statute and administrative rules granting authority to the nursing board to discontinue nursing programs, after finding that affidavits alleging injury from the rules were sufficient to withstand a motion to dismiss).

[¶ 70] The Housing Council has alleged a personal stake in the outcome and actual injuries in fact, concrete and particularized, not remote or speculative. The Housing Council supported their allegations by relying on *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), which reversed the dismissal of housing discrimination claims by a similar fair housing council, explicitly

holding the council alleged an injury in fact sufficient to meet standing as an aggrieved person under the federal Fair Housing Act. In *Havens*, the housing council claimed they had been "frustrated by ... racial steering practices in its efforts to assist equal access to housing through counseling and other referral services ... [and] has had to devote significant resources to identify and counteract [these] racially discriminatory steering practices." *Id.* In view of these allegations, the Court stated, "[T]here can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.* (citation omitted); *see also Cent. Ala. Fair Housing Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 640 (11th Cir.2000) (noting a majority of circuits have concluded, based on *Havens*, that a fair housing organization may recover in its own right for the diversion of its resources to combat housing discrimination under federal legislation).

[¶ 71] Here, the district court distinguished its ruling from the broad reach of *Havens* based on the legislative intent of the United States Congress "to exercise jurisdiction under the Federal Fair Housing Act to the fullest extent allowable...." This is not a distinction. The express legislative intent under this state's Human Rights Act in effect at the time in question was "to prohibit discrimination on the basis of ... status with regard to marriage" and "to prevent and eliminate discrimination in ... housing." N.D.C.C. § 14–02.4–01. The Housing Council's allegations are very similar to those alleged in *Havens*. *See Havens*, 455 U.S. at 372, 102 S.Ct. 1114 (stating the housing council must allege a distinct and palpable injury resulting from the discriminatory conduct); *see*

*also Carpenter*, 301 N.W.2d at 107 (conferring standing when litigants "have suffered some threatened or actual injury resulting from the putatively illegal action" and the harm must not be a generalized grievance shared by all or a large class of citizens). The Housing Council has alleged actual injuries, not a generalized grievance and not resting on rights and interests of third parties, by claiming the Petersons' discriminatory practices frustrated the Council's efforts and ability to pursue its mission and purposes to eliminate unlawful discrimination and forced the Council to devote significant resources to counteract the discriminatory conduct. *See Shark*, 545 N.W.2d at 200 (requiring allegations of either gaining or losing something, in order to establish a personal stake in the controversy, rather than a generalized grievance).

[¶ 72] The district court erred in relying on *Shark*, 545 N.W.2d at 198, to conclude the Housing Council's "entire claim ... is dependent upon alleged violations of other people[']s rights" and that without the Kippens the Housing Council would have only a theoretical claim of injury. Rather, *Shark* supports the Housing Council's claim of being aggrieved in fact by the Petersons' alleged housing discrimination. We determined Shark lacked standing because he failed to show he had suffered an actual and concrete injury, as opposed to an injury that is hypothetical, may occur in the future, and is contingent on other undetermined future events. *See Shark*, at 199–200 (holding Shark did not demonstrate how he will suffer economic injury or physical interference, and his generalized interest is shared with every other telephone customer anywhere, and any potential effect on him is remote and speculative). By contrast, the Housing Council has alleged actual, demonstrable injury to the Council's financial and other interests.

[¶ 73]  The district court granted the motion to dismiss under Rule 12, not a motion for summary judgment.  As the United States Supreme Court determined:

At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [for purposes of establishing standing], for on a motion to dismiss, we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."  In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts,"which for purposes of the summary judgment motion will be taken to be true.  And at the final stage, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted).

[¶ 74]  In another housing discrimination case, the United States Court of Appeals for the Third Circuit noted the "critical distinction" between examining allegations in the context of a motion to dismiss for lack of standing versus in the context of a motion for summary judgment.  *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers,* 141 F.3d 71, 76 (3d Cir.1998).  The Third Circuit affirmed summary judgment dismissing a fair housing council based on its failure to produce evidence to establish an actual injury: "While there is no dispute that the [Fair Housing Council's] damage allegations track the language in *Havens* and were *sufficient to withstand a motion to dismiss,* something more than these naked allegations was required at the summary judgment stage."  *Montgomery Newspapers,* at 76 (emphasis added).  Furthermore, the housing council in *Montgomery Newspapers* failed to show that any staff time at all was expended to investigate the alleged discriminatory newspaper advertisements and failed to prove a palpable, demonstrable injury to the council's activities.  *Id.* at 78.

[¶ 75]  Here, the Housing Council has alleged actual injuries, similar to those in *Havens,* and thus sufficient to survive a motion to dismiss under Rule 12.  The litigation was not at the summary judgment stage, which would require "something more than these naked allegations."  *See Montgomery Newspapers,* 141 F.3d at 76; *see also N.D. Fair Housing Council, Inc. v. Woeste,* Civ. No. A1–99–116 (D.N.D. 2000) (stating allegations of an injury in fact are sufficient to survive a motion to dismiss under *Havens,* but "something more would be required to withstand a motion for summary judgment"); *Alexander v. Riga,* 208 F.3d 419, 427 n. 4 (3d Cir.2000) (holding a fair housing council was an aggrieved person and had standing when it alleged it conducted a prelitigation investigation including fair housing testing, stopped everything else and devoted all attention to this case, and diverted resources to investigate and to counter the discriminatory conduct); *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27–29 (D.C.Cir.1990) (upholding standing for a fair housing council that devoted resources to investigating housing discrimination, which also necessitated increased educational efforts to counteract, and stating, "Like the organization in *Havens,* [the fair housing council] must ultimately prove at trial that the defendants' illegal actions actually caused them to suffer the alleged injuries before they will be entitled to judicial relief.").

[¶ 76]  Because the Housing Council has alleged it has suffered actual injuries in fact resulting from the Petersons' as-

serted illegal discrimination, and the injuries are not a generalized grievance but direct injuries to the Council's resources, the district court erred in dismissing the Council for lack of standing under Rule 12. The reasoning in *Rhame*, 231 N.W.2d at 808, remains unchanged: "Any doubt on the question of standing ... should be resolved in favor of ... any person aggrieved in fact" when deciding a motion brought under Rule 12, N.D.R.Civ.P.

### B

[¶ 77] The district court also erred in concluding the Housing Council was not a real party in interest under N.D.R.Civ.P. 17(a), which provides:

> Every action must be prosecuted in the name of the real party in interest.... No action may be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after the objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest....

A real party in interest is one with a real, actual, material, or substantial interest in the subject of an action, as opposed to one who has only a nominal, formal, or technical interest in or connection with the action. *Froling v. Farrar*, 77 N.D. 639, 642–43, 44 N.W.2d 763, 765 (1950). In *Froling*, the plaintiff and her husband were jointly conducting a collection agency and were mutually interested in the profits arising from this enterprise and would share in any benefits from the plaintiff's lawsuit to recover damages on an account assigned to her. *Id.* at 764–65. Although the plaintiff's husband was not named as a party, we determined that he in fact was a real party in interest, as he had a substantial interest in the subject of the action and in obtaining recovery, and properly might have been joined as a party plaintiff. *Id.* at 765.

[¶ 78] The Housing Council is a real party in interest to this lawsuit in that it asserts Petersons' alleged discrimination caused the Council to devote resources to investigating and counteracting unlawful conduct and to divert resources from other educational and outreach activities. These direct injuries, if proven, would give the Housing Council a real, actual, material, or substantial interest in this action, not a mere nominal connection, as the Council is seeking recovery for its own injuries.

### III

[¶ 79] The Petersons based their right to deny housing on the existence of the criminal statute dealing with unlawful cohabitation. The record is insufficient to apply that statute as a matter of law as the basis for the decision. I note the 2001 Legislative Assembly has passed a statute which, when it becomes effective, will deal directly with rental decisions like the one made by the Petersons. House Bill 1448 provides: "A new subsection to section 14–02.5–02 of the 1999 Supplement to the North Dakota Century Code is created and enacted as follows: Nothing in this chapter [N.D.C.C. ch. 14–02.5, Housing Discrimination] prevents a person from refusing to rent a dwelling to two unrelated individuals of opposite gender who are not married to each other." H.B. 1448 (March 27, 2001). However, our review of this case must be based on the law in effect at the time the cause of action arose. For the reasons set forth above, I would reverse the summary judgment in favor of the Petersons and the dismissal of the Housing Council and remand for further proceedings.

[¶ 80] Carol Ronning Kapsner.